No. 98-580

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 310

297 Mont. 225

991 P.2d 960

IN RE THE MARRIAGE OF

LINDA L. HOPPER,

Petitioner and Respondent,

and

ELVIN E. HOPPER,

Respondent and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

No

For Appellant:

Stephen C. Mackey, Towe, Ball, Enright, Mackey & Sommerfeld, Billings, Montana

For Respondent:

Kevin T. Sweeney, Sweeney & Healow, Billings, Montana

_____

Submitted on Briefs: March 11, 1999

Decided: December 9, 1999

Filed:

_____

Clerk

Justice William E. Hunt, Sr. delivered the Opinion of the Court.

1. ¶ This action originated in the Thirteenth Judicial District Court, Yellowstone County, when Linda L. Hopper (Linda) filed a Motion for Modification of Support and Motion for Order to Show Cause for Contempt. After a hearing held in April of 1995, the District Court modified the parties' child support obligations and ordered that Elvin E. Hopper (Elvin) pay $352 per month for support of the parties' remaining minor child; the court also ordered that Elvin pay an additional $100 per month to be applied towards a child support arrearage of $31,803. In 1998, Linda filed a Petition for Proceedings in Aid of Execution, For Determination of Civil Contempt for Non-Support, For Suspension of Licenses for Non-Support, and for

Renewal of Judgment. Following a hearing, the District Court issued an order holding Elvin in contempt of court for failing to pay child support and otherwise comply with the 1995 order, and suspending Elvin's Montana Driver's License, Montana Fishing and Hunting Licenses, and Montana Electrician's License.

2. ¶ Following issuance of the 1998 order, Elvin filed a motion for a new trial under Rule 59(a), M.R.Civ.P., for relief pursuant to Rule 60(b), M.R.Civ.P., and to amend findings or make additional findings of fact under Rule 52(b), M.R.Civ.P. The District Court denied Elvin's post-trial motions, and he appeals. We affirm.

## Issues Presented

3. ¶ Elvin raises three issues on appeal:

4. ¶ (1) Did the District Court abuse its discretion in refusing to grant a new trial pursuant to Rule 59(a), M.R.Civ.P., or to grant relief pursuant to Rule 60(b), M.R. Civ.P., because of Linda's allegedly fraudulent representations to the District Court at the 1995 hearing?

5. ¶ (2) Did the District Court abuse its discretion in denying Elvin the opportunity to introduce new evidence of the alleged arrearage at the 1998 hearing for suspension of his licenses?

6. ¶ (3) Are the license suspension provisions of §§ 40-5-701 to -713, MCA, inapplicable when the license suspension action is brought after the children have reached the age of majority and been emancipated but before a party has made payment of back child support?

## Factual and Procedural Background

7. ¶ On November 17, 1981, the District Court dissolved the marriage of Elvin and Linda. Under the court's Judgment and Final Decree of Dissolution of Marriage, Linda was granted custody of the parties' three minor children, and Elvin was ordered to pay child support in the amount of $150 a month for each child until reaching the age of majority. Thus, Elvin was obligated to pay a total of $450 per month in child support to Linda under the decree.

8. ¶ Linda's 1995 motion sought to increase the amount of monthly child support due from Elvin, and requested court enforcement of back, unpaid child support owed by Elvin under the 1981 decree of dissolution. Elvin was served with an order to show cause, and a hearing on the matter was held on April 19, 1995. Elvin appeared at that hearing *pro se*. When questioned by the court as to whether he wished to

proceed without counsel, Elvin answered in the affirmative. Linda appeared at the hearing and was represented by counsel.

9. ¶ At the 1995 hearing, Linda testified that during the many years which Elvin paid minimal child support, she was responsible for the care of the parties' three minor children and provided most of their financial support. Linda further testified that she had complete records of all child support payments received from Elvin over the years. Based on those records, Linda and her counsel moved for admission of an exhibit showing that, extending back to mid-1982, Elvin owed a total arrearage of $46,663 in unpaid child support. The exhibit was admitted into evidence without objection from Elvin. Linda also requested, due to the changed circumstances of Elvin's increased earning capacity and the increased expenses of providing for the parties' remaining minor child, that the District Court order that Elvin pay $500 per month in support for the minor child.

10. ¶ However, later in the same hearing, Linda's counsel conceded that the $46,663 arrearage amount was predicated on the mistaken assumption that Elvin owed $200 per child per month in support under the dissolution decree, rather than the $150 figure actually ordered by the court in 1981. Thus, Linda's counsel offered to go back through the record and rework the figure to correctly "establish the arrearage amount." Linda's counsel also conceded that the modified child support figure was "inaccurate," and stated that it should be "about $350 per month per child" in support for the remaining minor child.

11. ¶ To show that Linda's arrearage figure was inflated, Elvin introduced a document from the Montana Department of Social and Rehabilitation Services, Child Support Enforcement Division, showing an arrearage at that time of $22,675 in back child support owed by Elvin. Following admission of his exhibit, Elvin attested that even the agency's figure was unfairly inflated, and that he believed he owed only about $7,000 in unpaid child support.

12. ¶ However, Elvin admitted that he had maintained no financial records of his earnings or child support payments for most of the relevant time period and that he did not know how much he had actually paid to Linda in child support over the years. Therefore, he conceded on cross-examination that he had "no way to dispute" Linda's calculation of back child support. Elvin also acknowledged that, contrary to the 1981 decree of dissolution, he had largely failed to pay monthly child support and had entirely failed to maintain or contribute to health insurance coverage for the parties' minor children.

13. ¶ As to earning capacity, Elvin testified that he was a self-employed Master Electrician and admitted that he was capable of earning as much as $30 per hour

when self-employed. When employed by third parties, Elvin stated that he earned around $20 an hour. However, Elvin said that he refused to work for a third party, like a union, because of the fact that income taxes would be withheld from his paychecks. He asserted that it was his practice to maintain no financial records since he did not regularly file tax returns and believed that he had no obligation to pay taxes. According to Elvin, "record keeping is one of the worst things you can do in this country." Elvin also testified that he holds no bank accounts and owns nothing in his name. When asked on cross-examination whether he holds his property in other peoples' names so that it cannot be attached in satisfaction of back taxes, Elvin initially asserted "yes" but then chose to "declare the Fifth [Amendment] on that one."

14. ¶ At the conclusion of the 1995 hearing, the District Court addressed Elvin:

The Court is also going to have a judgment entered against you in an <u>amount to be determined by the Court based upon any further information, which either party can give me</u>. I'm not sure whether [the arrearage] should be $22,675, or if [it] should be something significantly more than that based upon the calculations of Miss Hopper. [It could b]e something less than that.

I can tell you this, <u>if you expect it to be less, you're going to have to show me some documentation whereby you show that you have made payments</u>, otherwise I'm going to have to go with one of these other two figures, or something in between one of these other two figures. I will try to look at this paperwork and decide what that amount should be. [Emphasis added.]

15. ¶ After the 1995 hearing, utilizing the Montana Child Support Guidelines, Linda's counsel calculated that the correct amount of child support due from Elvin for the parties' minor child was $352 per month and submitted the calculations to the court. Apparently, Linda's counsel also reworked the erroneous arrearage amount and arrived at a figure of $31,803. Consistent with this additional information, the District Court's 1995 order calculated Elvin's child support arrearage at $31,803 and his support obligation for the parties' remaining minor child at $352 per month. The order held Elvin in contempt of court for failing to comply with the requirements of the 1981 decree of dissolution for payment of monthly child support and maintenance of health insurance for the children. However, the court allowed Elvin the opportunity to purge the contempt by paying the current child support obligation of $352, as well as the additional $100 to be applied towards the support arrearage,

on or before the first of each month. The court also provided that if the parties' remaining minor child reached the age of majority before the support arrearage was satisfied, Elvin would continue to pay $452 a month until the arrearage was paid in full.

16. ¶ In 1998, Linda again petitioned the District Court for assistance in collecting child support from Elvin. A hearing was held on July 8, 1998, at which Elvin appeared with counsel and attempted to reopen the question of the amount of back child support owed. The District Court determined that the issue was *res judicata*, having already been established in 1995, and refused to revisit the matter. However, the court permitted Elvin's counsel to make an offer of proof disputing the amount of back child support owed by introducing records of child support payments made by Elvin over the years, and by showing that two of the parties' minor children resided with Elvin for a period of time during which he was obligated to pay child support. Subsequently, when asked to testify about his business earnings, Elvin declared that he would "take the Fifth [Amendment] on that." The District Court again found Elvin in contempt for failing to pay child support. Thus, the court sentenced him to five days in jail, and suspended his licenses until further order of the court.

17. ¶ Thereafter, Elvin filed post-trial motions again attempting to reopen the question of the amount of his child support arrearage. The District Court rejected these motions, noting that Elvin "had the opportunity to refute that payment record in the 1995 hearing," and that "the problem with [Elvin's] argument is that in fact the evidence could have been presented in 1995." Thus, the court again refused to "re-litigate" the matter. Elvin appeals.

## Discussion

18. ¶ (1) Did the District Court abuse its discretion in refusing to grant a new trial pursuant to Rule 59(a), M.R.Civ.P., or to grant relief pursuant to Rule 60(b), M.R. Civ.P., because of Linda's allegedly fraudulent representations to the District Court at the 1995 hearing?

19. ¶ Elvin requested relief from the District Court's judgment for Linda's allegedly fraudulent representations during the 1995 hearing, which he claimed entitled him either to a new trial pursuant to Rule 59(a), M.R.Civ.P., or to introduce new evidence at the 1998 hearing pursuant to Rule 60(b), M.R.Civ.P., refuting the "payment record" established in 1995. "The decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of that discretion." Baxter v. Archie Cochrane Motors,

Inc. (1995), 271 Mont. 286, 287-88, 895 P.2d 631, 632 (citing Jim's Excavating Serv., Inc. v. HKM Assocs. (1994), 265 Mont. 494, 511, 878 P.2d 248, 259). The standard of review of a trial court's decision to grant or deny a Rule 60(b), M.R.Civ.P. motion, depends upon the issues involved. Where, as here, there is a discretionary appraisal or weighing by the district court of the facts of the case, we review the court's determination under an abuse of discretion standard. In re Marriage of Barnes (1992), 251 Mont. 334, 336, 825 P.2d 201, 203.

20. ¶ Elvin claims on appeal, as he did before the District Court, that Linda fraudulently represented to the court that the parties' three minor children lived with her during the entire period for which she claimed back child support from Elvin, and that Linda also failed to disclose all of the child support payments received from Elvin over the years. Because of these alleged "misrepresentations," Elvin contends that the District Court abused its discretion in denying the parties the opportunity in 1998 "to put on a full airing of all evidence."

21. ¶ On appeal, Elvin's scattered arguments focus primarily on the District Court's denial of his Rule 60(b), M.R.Civ.P., motion. Elvin appears to rely principally upon Rule 60(b)(3), M.R.Civ.P., but also argues that he should be accorded relief under Rule 60(b)(6), M.R.Civ.P. However, it is established law that the first five subsections of the rule are mutually exclusive of subsection (6) and, thus, a party seeking relief under one of the first five subsections of the rule is prohibited from also claiming relief under the general catchall subsection, Rule 60(b)(6), M.R.Civ.P. Koch v. Billings School Dist. No. 2 (1992), 253 Mont. 261, 265, 833 P.2d 181, 183. We treat Elvin's claim as arising under Rule 60(b)(3), M.R.Civ.P., and, for that reason, will not address his claim based on Rule 60(b)(6), M.R.Civ.P., the general catchall subsection.

22. ¶ A motion brought pursuant to "reasons (1), (2), or (3)" of Rule 60(b), M.R.Civ.P., may be granted only if the motion is made not more than sixty days after service of notice of entry of judgment. Rule 60(b), M.R.Civ.P. In this case, following issuance of the 1995 order, Linda failed to ever file and serve notice of entry of judgment as required by Rule 77(d), M.R.Civ.P. However, Elvin's counsel filed notice of entry of judgment on July 9, 1998. Thereafter, Elvin's motion for relief pursuant to Rules 59 (a) and 60(b), M.R.Civ.P., was timely filed on July 20, 1998, within sixty days of notice of entry of judgment.

23. ¶ Thus, we agree with Elvin that he timely brought a Rule 60(b)(3), M.R.Civ.P., motion. Rule 60(b)(3), M.R.Civ.P., provides that a court may relieve a party from a final judgment, order, or proceeding where there is a showing of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other

misconduct of an adverse party . . . ." Rule 60(b)(3), M.R.Civ.P. Under Rule 60(b)(3), M.R.Civ.P., Elvin argues that Linda committed "fraud on the court" from which he should be relieved. However, as Linda points out, an independent equitable action to set aside a judgment for fraud on the court may be entertained only under the residual clause of Rule 60(b), M.R.Civ.P., which provides:

This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as may be required by law, or to set aside a judgment for fraud upon the court.

Rule 60(b), M.R.Civ.P.

24. ¶ The type of fraud for which relief may be granted in an independent equitable action is extrinsic or collateral, rather than intrinsic fraud. See Brown v. Jensen (1988), 231 Mont. 340, 345-46, 753 P.2d 870, 874 (quoting Minter v. Minter (1936), 103 Mont. 219, 229, 62 P.2d 233, 236) (noting that the residual clause of Rule 60(b)(3), M.R.Civ.P., applies " 'only to fraud which is extrinsic or collateral to the matter tried by the court, and not to fraud in the matter on which judgment was rendered' "). Here, Elvin points to Linda's allegedly fraudulent testimony at the 1995 hearing as the basis for granting relief from Linda's alleged fraud upon the District Court. As we have stressed in the past, however, false or fraudulent representations or concealments made by a party during the court proceedings constitute only intrinsic fraud. Falcon v. Faulkner (1995), 273 Mont. 327, 332, 903 P.2d 197, 200 (citing In re Marriage of Lance (1981), 195 Mont. 176, 180, 635 P.2d 571, 574). Correspondingly, this Court has repeatedly held that fraud between the parties, such as perjured testimony at trial, does not rise to the level of fraud upon the court. In re Marriage of Doyle (1996), 280 Mont. 429, 433, 929 P.2d 886, 889; In re Marriage of Miller (1995), 273 Mont. 286, 292, 902 P.2d 1019, 1022 (citing Wise v. Nirider (1993), 261 Mont. 310, 316, 862 P.2d 1128, 1132; Traders State Bank of Poplar v. Mann (1993), 258 Mont. 226, 236, 852 P.2d 604, 610, overruled on other grounds by Turner v. Mountain Eng'g and Constr., Inc. (1996), 276 Mont. 55, 915 P.2d 799; Brown v. Small (1992), 251 Mont. 414, 421, 825 P.2d 1209, 1213; Salway v. Arkava (1985), 215 Mont. 135, 141, 695 P.2d 1302, 1306).

25. ¶ Extrinsic fraud is an intentional act by the prevailing party that prevents the unsuccessful party from having a fair submission of the controversy, and the fraud, to be extrinsic, "must deny the unsuccessful party the opportunity to have a trial or

to fully present her or his side of the case." In re Marriage of Miller (1993), 260 Mont. 15, 22, 858 P.2d 338, 342 (citing Brown, 251 Mont. at 420, 825 P.2d at 1213; Marriage of Barnes , 251 Mont. at 337, 825 P.2d at 204; Marriage of Lance, 195 Mont. at 179-80, 635 P.2d at 574). We conclude that Elvin has failed to demonstrate that Linda committed extrinsic fraud rising to the level of fraud upon the court. There is no indication that any actions of Linda, whether intentional or otherwise, prevented Elvin from having a fair submission of the arrearage controversy in 1995.

26. ¶ Nor can we agree with Elvin that he should be entitled to relief under Rule 60(b)(3), M.R.Civ.P., for intrinsic fraud. Principally, Elvin attacks Linda's representation at the 1995 hearing that the parties' three minor children resided with her during the entire period for which she was claiming back child support, when in fact the two eldest children resided with Elvin for a period of time. However, we cannot agree that Linda's testimony concerning the parties' living arrangements for their minor children constitutes intrinsic fraud. In fact, Elvin's testimony at the 1995 hearing expressly rebutted Linda's representations:

A: . . . . I had the two oldest kids living with me.

Q: How long did they live with you?

A: Year and a half, two years, I don't know.

Q: Mr. Hopper, while those children were living with you, you didn't ask the Court to relieve you of your support obligation, did you?

A: No . . . .

Since both the parties and the District Court were aware that the two oldest children resided with Elvin for a period of time during which Linda was claiming back support, it cannot be claimed that Linda acted fraudulently in that respect or that her representations were misleading or relied upon by Elvin to his prejudice.

27. ¶ Regarding Elvin's claim that the District Court should have permitted him to introduce records of past child support payments at the 1998 hearing, Elvin had more than ample opportunity to present his side of the controversy in 1995. Linda's counsel admitted to the District Court that both the calculation of monthly child support and the arrearage figure contained in the exhibit admitted at the 1995

hearing were inaccurate. The District Court, being aware of these inaccuracies, admitted the exhibit but indicated that it would not be given undue "weight" in the court's determination. Furthermore, the District Court gave Elvin a financial "break" in that the court declined at the close of the 1995 hearing to include in the arrearage amount Elvin's total failure to maintain health insurance for the children. Lastly, the District Court provided both Linda and Elvin with the opportunity to submit additional information after the 1995 hearing but before the court rendered its decision, so as to help the court reach an equitable figure. Linda submitted additional information; Elvin did not.

28. ¶ On appeal, much of Elvin's contentions focus on the fact that he was a *pro se* litigant at the 1995 hearing and did not have the benefit of counsel to assist him in reconstructing his payment records and presenting that information to the court. "[N]ow that counsel are involved," he feels he should be entitled to correct factual inaccuracies which, as the District Court reasoned, could have been set straight in 1995 when the court ruled on Elvin's back child support obligations. However, Elvin clearly chose to proceed without counsel in 1995. And, given Elvin's uncooperative and downright standoffish attitude at the 1995 hearing, we cannot fault the District Court for declining to reopen an issue in 1998 that should have been attended to by Elvin in 1995. While it is a cherished and jealously protected feature of our justice system that litigants are entitled to proceed without the assistance of counsel, a great many *pro se* litigants discover, with hindsight, that they would have been better off had they retained the assistance of counsel. Regrettably, if there was anything which prevented Elvin from having a fair submission of the controversy in this case, it was Elvin's outright defiance of the justice system. "The law helps the vigilant before those who sleep on their rights." Section 1-3-218, MCA.

29. ¶ "There must be some point at which litigation ends and the respective rights between the parties are forever established." Karlen v. Evans (1996), 276 Mont. 181, 184, 915 P.2d 232, 235. Thus, because of the public policy underlying the finality of judgments, " 'courts look with a jealous eye upon suits which have for their object setting aside a judgment at law . . . .' " Brown, 231 Mont. at 346, 753 P.2d at 874 (quoting Minter, 103 Mont. at 231, 62 P.2d at 236); see also Hopper v. Hopper (1979), 183 Mont. 543, 554, 601 P.2d 29, 35 ("[T]his Court has recognized a public interest in the finality of judgments."). Rule 60(b), M.R.Civ.P., constitutes an exception to the doctrine of finality of judgments. Karlen, 276 Mont. at 184, 915 P.2d at 235. However, the rule is designed to be applied primarily as an exception to the finality of a judgment where a party was wronged through no fault of its own. Where a party fails to but could have submitted evidence in support of its claim or

defense, that party's "desire to retroactively argue a factual issue in the case" is not a sufficient reason justifying the setting aside of a judgment. Cf. Falcon, 273 Mont. at 334, 903 P.2d at 201 (holding that where a party chooses not to appear in an action and the court relies on evidence submitted by the other party, a default judgment will not be set aside).

30. ¶ We hold that the District Court did not abuse its discretion in denying Elvin's request to set aside the judgment pursuant to Rule 60(b), M.R.Civ.P. Elvin failed to avail himself of the opportunity to present the appropriate information at the 1995 hearing, and we decline to upset the finality of that judgment now. We further hold, therefore, that the District Court did not manifestly abuse its discretion in denying Elvin's motion for a new trial pursuant to Rule 59(a), M.R.Civ.P.

(2) Did the District Court abuse its discretion in denying Elvin the opportunity to introduce new evidence of the alleged arrearage at the 1998 hearing for suspension of his licenses?

31. ¶ Elvin asserts that the court erred in not permitting him to introduce evidence of the amount of the alleged arrearage at the 1998 hearing on suspension of his licenses. The license suspension provisions of the Montana Code specifically provide, as Elvin points out, that the amount of support is an issue "that may be determined in a hearing under this section . . . ." Section 40-5-703(3), MCA (emphasis added). At the 1998 hearing, the District Court declined to reopen the question of the amount of arrearage, stating: "I don't think we're here to talk about the amount. I think that has been established." Although Elvin acknowledges that the statute is clearly discretionary with the court, he argues, nonetheless, that "it is only right that the proper amount should be determined in a license suspension proceeding, . . . where, as here, the subject of the hearing appeared pro se at an earlier hearing which was held for another purpose . . . ."

32. ¶ In light of our discussion under issue one, we hold that the District Court did not abuse its discretion in denying Elvin an opportunity to reopen the question of the arrearage amount at the 1998 hearing on suspension of his licenses. The amount of arrearage was an issue which Elvin had a clear opportunity to address in 1995. Having failed to address that issue when he had the opportunity, Elvin should not be heard to now complain.

33. ¶ (3) Are the license suspension provisions of §§ 40-5-701 to -713, MCA, inapplicable when the license suspension action is brought after the children have reached the age of majority and been emancipated but before a party has made

payment of back child support?

34. ¶ Elvin argues that the provisions for suspension of occupational and other state-issued licenses, although codified in civil statutes, are "clearly punitive in nature." Being allegedly penal in nature, Elvin avers, therefore, that the license suspension statutes must be strictly construed by this Court. See Shipman v. Todd (1957), 131 Mont. 365, 368, 310 P.2d 300, 302 (stating that penal statues are to be strictly construed). In turn, Elvin argues that when strictly construing the license suspension provisions of the Montana Code, it becomes clear that Linda is "simply attempting to enforce an ordinary civil debt" to which the license suspension statutes are, by their plain language, inapplicable. We disagree.

35. ¶ Section 40-5-703, MCA, provides that if a support enforcement entity, including a district court, "determines that the obligor owes a delinquency," then "the support enforcement entity shall issue an order suspending the obligor's license and ordering the obligor to refrain from engaging in the licensed activity." Section 40-5-703(5), MCA. The word "delinquency" is defined as "a support debt or support obligation due under a support order in an amount greater than or equal to six months' support payments as of the date of service of a notice of intent to suspend a license." Section 40-5-701(2), MCA. Here, it is undisputed that Elvin was not just months, but years delinquent in child support payments.

36. ¶ The license suspension statutes further provide that a "support debt" or "support obligation" is the "amount created by the failure to provide or pay . . . support to a child under the laws of this or any other state or under a support order . . . ." Section 40-5-701(13)(a), MCA (emphasis added). A "child" is defined, correspondingly, as "a person under 18 years of age who is not emancipated, self-supporting, married, or a member of the armed forces of the United States . . .;" "a person under 19 years of age who is still in high school . . . ." Section 40-5-701(1)(a)(i)(ii), MCA. Thus, according to Elvin, the license suspension statutes are plainly intended to apply only to a person who is taking care of a "child" at the time the enforcement proceeding is initiated. The evidence is undisputed in this case that the license suspension proceeding was brought by Linda nearly a year after the parties' youngest child had turned eighteen and graduated from high school. Since there was no "child" at issue when Linda initiated the enforcement proceeding, Elvin contends that Linda is merely "seeking to enforce a civil obligation that had previously accrued while her children still [sic] minors and unemancipated or still in high school."

37. ¶ We reject at the outset Elvin's attempts to analogize unpaid child support obligations to ordinary civil debt. As amicus curiae the Montana Department of Public Health and Human Services (the Department) forcefully asserts, the law

treats child support debt differently from ordinary civil debt. Indeed, as we have recognized, parents have not only a legal obligation, but also a social and moral responsibility to support their children. State Dep't of Revenue v. Hubbard (1986), 222 Mont. 156, 160, 720 P.2d 1177, 1179; In re Marriage of Hickey (1984), 213 Mont. 38, 45, 689 P.2d 1222, 1226. Therefore, support of children transcends ordinary individualistic matters, rising to the level of a social obligation that a parent owes not only to their children but to the state as well. See Fitzgerald v. Fitzgerald (1980), 190 Mont. 66, 69-70, 618 P.2d 867, 868-69. In short, the obligation to support one's children is of a higher order than ordinary civil debt. For this reason, the law does not look lightly upon those who fail to make a good faith effort to discharge their child support obligations when they are capable of doing so.

38. ¶ In light of the foregoing, Elvin's reliance on In re Marriage of Mikesell (1996), 276 Mont. 403, 916 P.2d 740, is misplaced. In Marriage of Mikesell, the sole issue on appeal was whether social security benefits could be garnished for unpaid maintenance that had accrued after a corresponding child support obligation had terminated but remained unpaid. Marriage of Mikesell, 276 Mont. at 404, 916 P.2d at 741. Although social security benefits are generally exempt from garnishment, § 25-13-608(2)(b), MCA, provides a narrow exception which permits the garnishment of social security benefits if the debt constitutes maintenance to be paid to the custodial parent of a child for whom the non-custodial parent also owes child support.

39. ¶ The District Court in Marriage of Mikesell concluded that § 25-13-608(2)(b), MCA, permits social security benefits to be garnished for all unpaid maintenance if child support amounts remain owing. Marriage of Mikesell, 276 Mont. at 406, 916 P.2d at 742-43. This Court disagreed with the District Court's construction, and concluded that in order for social security benefits to be garnished for maintenance, the plain language of the statute required that the former spouse be the custodial parent of the child for whom support is owed. Marriage of Mikesell, 276 Mont. at 407, 916 P.2d at 743. As the child in Marriage of Mikesell had reached the age of majority, we concluded that the former wife was no longer a custodial parent of a child and, therefore, was not entitled to execute upon the social security benefits of the obligated former husband to collect spousal maintenance that had accrued after emancipation of the child and the termination of child support obligations. Marriage of Mikesell, 276 Mont. at 407-08, 916 P.2d at 743-44.

40. ¶ Elvin urges this Court to reach a similar result here, and hold that once a child has reached the age of majority, a back child support obligation becomes transformed into ordinary civil debt which is not enforceable by a license suspension proceeding.

However, our decision in <u>Marriage of Mikesell</u> was premised on the particular language of § 25-13-608(2)(b), MCA, and is thus inapposite to the issue in this case. Moreover, <u>Marriage of Mikesell</u> stands only for the narrow proposition that a debt for maintenance which accrues <u>after</u> children emancipate is to be treated as an ordinary civil debt for purposes of garnishment of social security benefits. Indeed, in <u>Marriage of Mikesell</u>, we permitted the garnishment of the obligor parent's social security benefits to recover back spousal maintenance owed to the custodial parent that had accrued <u>prior</u> to emancipation of the child and termination of child support obligations. <u>See</u> <u>Marriage of Mikesell</u>, 276 Mont. at 407-08, 916 P.2d at 743 (holding that § 25-13-608(2)(b), MCA, authorizes garnishment of a parent debtor's social security benefits "to the extent that the maintenance is <u>or was</u> to be paid to the former spouse while the former spouse was the custodial parent of the child to whom child support is due and owing") (emphasis added).

41. ¶ Thus, we refuse to inappropriately expand the rationale of <u>Marriage of Mikesell</u> to hold that a debt for back child support which accrued <u>prior</u> to emancipation of the children and which remained unpaid after the point of emancipation transforms that obligation into ordinary civil debt to which the license suspension statutes are inapplicable. Given a parent's heightened moral and legal obligation to support their children, we agree with the Department that such a construction could "inappropriately reward" an obligor parent for failing to pay child support. While Linda has permitted the child support arrearage to accumulate over the years that Elvin paid minimal support, we would be remiss to permit Elvin's failure to pay child support to inure to his profit or benefit. <u>Cf</u>. <u>Fitzgerald</u>, 190 Mont. at 69-71, 618 P.2d at 869 (rejecting application of the doctrine of laches or estoppel to the recovery of back child support where the child's custodian had failed to promptly seek enforcement of a support order). As discussed below, the license suspension statutes were clearly intended by the Montana Legislature to be remedial in nature and, therefore, remain available to reach unpaid child support obligations which accrued before emancipation but which remain unpaid by the obligor parent.

42. ¶ In 1993, the license suspension provisions were enacted by the Montana Legislature amid increasing social concerns over Montana parents who, although financially capable of rendering child support, were utterly failing to do so. As the Department points out, nonsupport of children carries grave implications for the public *fisc*:

Ideally, government agencies such as the CSED [Child Support Enforcement Division] should not be involved in enforcing fundamental parental responsibilities.

But the fact remains that many parents in Montana are not supporting their children. $100 million is owed in back support. Regrettably, many parents <u>can</u> afford to support their children. Many delinquent parents have income, assets, and an adequate standard of living, yet their children are subsisting at or below the poverty level.

<u>State License Suspension: Hearing on H.B. 482</u> <u>Before the House Judiciary Comm.</u>, 53rd Legis.,(testimony statement of Mary Ann Wellbank, CSED Administrator) (Exhibit 3).

43. ¶ Hence, the legislative intent underlying the license suspension provisions of the Montana Code was to emphasize as matter of public policy that child support obligations have the highest priority in a parent's allocation of income to debt:

Our intent is to make clear that it is the public policy of the state of Montana that the support of children is of the highest priority in the allocation of a responsible parent's income. Our goal is not for parents to lose income through license denial, but to make financially responsible parents aware of the risk of losing their chosen livelihood if they do not make a good faith effort to pay child support. Presumably, once they are aware of this risk, financially responsible parents will begin complying with support orders. . . . [I]f enacted into law this bill will place financial responsibility for children where it belongs, and that is with the child's parents . . . not the state.

<u>State License Suspension: Hearing on H.B. 482</u> <u>Before the House Judiciary Comm</u>., 53rd Legis., (opening statement of bill's sponsor, Representative John Bohlinger) (Exhibit 1).

44. ¶ The license suspension statutes were clearly intended to be remedial in nature, not punitive. The statutes protect the public's interest in having parents, not the state, shoulder financial responsibility for children. Nor do we think, as Elvin suggests, that this remedial purpose ceases to exist when the license suspension proceeding is initiated after the children have reached the age of majority and been emancipated but before a delinquent parent satisfies back child support obligations.

45. ¶ We take guidance from our decision in Willoughby v. Loomis (1994), 264 Mont. 44, 869 P.2d 271. In <u>Willoughby</u>, the custodial mother sought to collect a child support arrearage from her former husband, who for nine years had completely

failed to pay any child support due the mother under a dissolution decree. The Jefferson County Attorney initiated an action to collect back child support from the former husband pursuant to the Revised Uniform Reciprocal Enforcement of Support Act (RURESA). The District Court determined that the former husband owed substantial back child support. Subsequently, in ruling on a motion for contempt of court filed against the former husband by the Beaverhead County Attorney, the District Court dismissed the State as a party to the action since the child was by that time an adult who could execute on the judgment. See Willoughby, 264 Mont. at 46-48, 869 P.2d at 272-73.

46. ¶ On appeal, this Court disagreed with the District Court's application of the doctrine of "merger" to hold that the action for child support no longer existed and that the effect of the child attaining the age of majority was to transform the character of the action to one of action on the judgment with the former child having the power to obtain the judgment. Willoughby, 264 Mont. at 54, 869 P.2d at 277. Rather, we concluded that the District Court erred in determining that since the child had reached the age of majority, the former child was now the real party in interest. Thus, we held that the mother was entitled to the receive the full arrearage amount. Willoughby, 264 Mont. at 55, 869 P.2d at 278.

47. ¶ The holding of Willoughby was premised on the following legal principles and equitable circumstances, which guide our resolution of this appeal:

[S]upport is to be paid to the custodial parent for the purpose of aiding the child; but we will not tell the custodial parent how to spend the money that has been awarded. The money used by [the mother] to care for her minor child, came exclusively from her own sources. The court ordered [the father] to provide support at a sum certain each month and he did not comply with the order. But it is not within the court's discretion to bypass the custodial parent. We have previously stated that where the father has been obligated by divorce decree to pay support to the mother, the father cannot discharge his duty by giving the money to the child directly.

Willoughby, 264 Mont. at 55, 869 P.2d at 278 (citations omitted).

48. ¶ Similarly, in this case, we determine that the child support arrearage owed by Elvin, rather than being merged into the judgment, maintained its original character after the parties' youngest child emancipated. That is, the arrearage remains a child support debt due the custodial parent, Linda, as ordered by the 1981 dissolution decree. Because of Elvin's failure to pay child support for many years, Linda, as the

custodial parent, was effectively forced to provide for the parties' minor children from her own sources. However, that support should have come from Elvin's sources and been paid to Linda, as the children's custodian. Therefore, Linda should not now be limited in her ability to collect on that debt through use of the license suspension statutes.

49. ¶ In general, child support which is due under a dissolution decree but which remains unpaid becomes a judgment debt similar to any other money judgment. Emery v. State, Dep't of Pub. Health (1997), 286 Mont. 376, 383, 950 P.2d 764, 768. As such, the collection of back child support is subject to a ten year statute of limitations. See § 27-2-201(3), MCA. Other than being limited by that time period, a custodial parent to whom back child support is owed under a dissolution decree has recourse to any of the collection remedies permitted by law. Among the variety of remedies available to collect back child support, we have previously tacitly approved of the use of the license suspension statutes as a remedy to collect child support arrearages. See Emery, 286 Mont. at 383-84, 950 P.2d at 768-69. Today, we expressly approve of the use of the license suspension statutes, §§ 40-5-701 to -713, MCA, as a collection remedy available to the former custodial parent for enforcing past-due child support owed by the non-custodial parent under a court order.

50. ¶ We hold that license suspension remains an available collection remedy for the former custodial parent regardless of whether the children for whom the support was ordered have achieved emancipation. While license suspension is a drastic remedy, Elvin's persistent failure to honor his child support obligations left the District Court with no alternative.

51. ¶ The District Court is affirmed in all respects.

/S/ WILLIAM E. HUNT, SR.

We Concur:

/S/ J. A. TURNAGE

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

No

/S/ W. WILLIAM LEAPHART