No. 99-281

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 277

296 Mont. 510

989 P.2d 840

---

IN THE MATTER OF J.M.J.,

A Youth in Need of Care.

---

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Big Horn,

The Honorable Susan P. Watters, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

D. Michael Eakin, Montana Legal Services Association,

Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Mark W. Mattioli,

Assistant Attorney General; Helena, Montana

Christine A. Cooke, Big Horn County Attorney; Hardin, Montana

_____

Submitted on Briefs: September 23, 1999

Decided: November 19, 1999

Filed:

_____

Clerk

Justice Karla M. Gray delivered the Opinion of the Court.

1. ¶ Sada Gonzales (Sada) appeals from the Findings of Fact, Conclusions of Law and Order entered by the Thirteenth Judicial District Court, Big Horn County, terminating her parental rights to J.M.J. and awarding permanent legal custody with the right to consent to adoption to the Montana Department of Public Health and Human Services (DPHHS). We affirm.
2. ¶ We restate the issues on appeal as follows:
3. ¶ 1. Are the District Court's findings that Sada failed to complete or meet the goals of her treatment plan and that the conduct and condition rendering her unfit to parent J.M.J. is unlikely to change within a reasonable time clearly erroneous?
4. ¶ 2. Did the District Court abuse its discretion in terminating Sada's parental rights

when a less restrictive alternative existed?

## *BACKGROUND*

5. ¶ Sada and Jade Johnston (Jade) are the natural parents of a son, J.M.J., who was born on May 25, 1995. DPHHS began receiving reports of child abuse or neglect regarding J.M.J. in early 1996, including reported abandonment, frequent use of alcohol and drugs by both Jade and Sada, and domestic violence. DPHHS monitored the situation with the assistance of J.M.J.'s grandparents.

6. ¶ On January 3, 1997, Sada and J.M.J. were staying with Sada's mother, Marta Burgman (Marta), when a domestic dispute arose between Jade and Sada. Jade was arrested and Sada was hospitalized as a result of this incident. Marta took J.M.J. to DPHHS, who placed him in the care of a paternal aunt. DPHHS subsequently petitioned for temporary investigative authority and protective custody, and entered into court-approved treatment plans with Sada and Jade addressing issues of domestic violence, chemical dependency, psychological and mental health needs, and a stable environment for J.M.J. On January 27, 1997, after hearing testimony at a show cause hearing, the District Court granted temporary investigative authority until April 27, 1997, but ordered DPHHS to return J.M.J. to the care and custody of Marta, with whom Sada was living. The court also provided for visitation of J.M.J. by Jade.

7. ¶ DPHHS returned J.M.J. to Marta. Several weeks later, however, Marta and Sada signed Voluntary Agreements for Placement, returning J.M.J. to DPHHS because they were unable to care for him. DPHHS again placed J.M.J. in the care of his paternal aunt.

8. ¶ DPHHS monitored Sada and Jade's progress on their treatment plans during the period of temporary investigative authority. Sada complied with her plan's requirement that she undergo a psychological evaluation, but did not meet the numerous other requirements in her treatment plan. Indeed, she expressed both a concern that she might not be as able to care for J.M.J. as another family member and a desire to place J.M.J. for adoption. Jade, on the other hand, expressed a desire to care for J.M.J., but was awaiting trial on his fourth charge of driving under the influence of alcohol and did not even begin his treatment plan.

9. ¶ On April 28, 1997, DPHHS petitioned for--and the District Court granted--a 90-day extension of temporary investigative authority and protective services and, thereafter, both Sada and Jade made progress on their treatment plans. Sada completed a substance abuse evaluation which indicated she was chemically

dependent and scheduled herself for intensive outpatient treatment as recommended by the evaluator. Jade scheduled himself for inpatient substance abuse treatment upon his release from incarceration for driving under the influence of alcohol. On June 6, 1997, DPHHS entered into new court-approved treatment plans with Sada and Jade which focused on the same issues as the original treatment plans.

10. ¶ Two months later, DPHHS placed J.M.J. in the care of his paternal grandmother, Karen Johnston (Karen), to facilitate visitation with Sada, and entered into a third set of court-approved treatment plans with Sada and Jade which focused on the same issues as the two earlier plans. The District Court granted DPHHS another 90-day extension of temporary investigative authority and protective services on August 11, 1997.

11. ¶ Shortly thereafter, Sada completed her intensive outpatient treatment; she did not, however, follow through with the recommended aftercare as required by her treatment plan. She was hospitalized for overdosing on "laced" marijuana within eight days of completing her outpatient treatment, and was hospitalized again about six weeks later for overdosing on anti-depressant medication after a fight with her live-in boyfriend.

12. ¶ On November 6, 1997, DPHHS petitioned for six months' temporary legal custody of J.M.J. and entered into its fourth set of court-approved treatment plans with Sada and Jade which again focused on domestic violence, chemical dependency, psychological and mental health needs, and a stable environment for J.M.J. Jade had just been released from the Big Horn County detention facility at that time and was scheduled to begin inpatient treatment for his chemical dependency. Sada, on the other hand, was hospitalized for suicide ideations following another violent incident with her live-in boyfriend and, on her release, was admitted to an inpatient chemical dependency treatment program. The District Court held a hearing on DPHHS' petition on November 24, 1997; neither Sada nor her counsel were present, and, indeed, both Jade and Sada were in inpatient chemical dependency treatment at the Montana Chemical Dependency Center. The court granted the petition for temporary custody without objection.

13. ¶ Sada and Jade moved to Wyoming on January 21, 1998, after completing their inpatient treatment. Although they attended a few Alcoholics Anonymous (AA) meetings in Wyoming, neither Sada nor Jade followed through with aftercare, Narcotics Anonymous (NA) or counseling as recommended by their discharge summaries and required by their treatment plans. They returned to Montana on March 9, 1998, and moved to Billings the following month. A month later, Jade left Billings.

14. ¶ In May of 1998, DPHHS petitioned to terminate Sada and Jade's parental rights and for permanent legal custody of J.M.J. At the hearing in October of 1998, Sada testified that she would like to be J.M.J.'s mother and take care of him, but she was unsure when she would be able to do so. Jade consented to the termination of his parental rights. The District Court terminated Sada and Jade's parental rights and awarded DPHHS permanent legal custody of J.M.J. with the right to consent to adoption. Sada appeals.

## STANDARDS OF REVIEW

15. ¶ In a termination of parental rights case, we review a district court's findings of fact to determine whether they are clearly erroneous. *In re S.M.*, 1999 MT 36, ¶ 15, 975 P.2d 334, ¶ 15, 56 St.Rep. 152, ¶ 15 (citations omitted). A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or a review of the record leaves us with the definite and firm conviction that the court made a mistake. *In re S.M.*, ¶ 15 (citation omitted).

16. ¶ The determination that a termination of parental rights is appropriate is a discretionary ruling which we review for an abuse of discretion. *See Matter of C.M.* (1997), 281 Mont. 183, 186, 932 P.2d 1063, 1065. The test for abuse of discretion is whether the trial court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *Matter of M.M.* (1982), 200 Mont. 244, 250, 650 P.2d 784, 787 (citation omitted).

## DISCUSSION

17. **¶ 1.  Are the District Court's findings that Sada failed to complete or meet the goals of her treatment plan and that the conduct and condition rendering her unfit to parent J.M.J. is unlikely to change within a reasonable time clearly erroneous?**

18. ¶ Section 41_3_609, MCA (1995), sets forth the criteria for termination of parental rights and provides, in pertinent part:

(1) The court may order a termination of the parent-child legal relationship upon a finding that any of the following circumstances exist:

. . .

(c) the child is an adjudicated youth in need of care and both of the following exist:

(i) an appropriate treatment plan that has been approved by the court has not been complied with by the parents or has not been successful; and

(ii) the conduct or condition of the parents rendering them unfit is unlikely to change within a reasonable time[.]

Here, the District Court made the findings required by §§ 41_3_609(1)(c)(i) and (ii), MCA (1995).

19. ¶ Sada does not challenge the District Court's finding that J.M.J. was an adjudicated youth in need of care. She contends, however, that DPHHS failed to present clear and convincing evidence that she did not successfully complete any of the court-approved treatment plans and that the conduct or condition rendering her unfit to parent J.M.J. was unlikely to change within a reasonable time and, as a result, that those findings of fact are clearly erroneous. Sada argues in this regard that DPHHS failed to present any evidence on her progress--or lack thereof--in the seven months prior to the hearing on termination of her parental rights and that, had the court considered her evidence regarding her progress during this period, it would have found that she had met the goals of her treatment plan.

20. ¶ Before addressing the findings at issue, it is appropriate to address Sada's reliance on the "clear and convincing evidence" standard. It is true that DPHHS was required to establish by clear and convincing evidence that the statutory criteria for termination of parental rights had been met. *See Matter of J.L.* (1996), 277 Mont. 284, 288, 922 P.2d 459, 461 (citations omitted). Clear and convincing evidence, however, is merely

"a requirement that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the evidence or by a clear preponderance of proof. This requirement does not call for unanswerable or conclusive evidence. The quality of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure--that is, it must be more than a mere preponderance but not beyond a reasonable doubt."

*Matter of J.L.*, 277 Mont. at 289, 922 P.2d at 462 (quoting *In the Interest of S.M.Q.*

(Kan. 1990), 796 P.2d 543, 545). Thus, the fact that evidence conflicts does not automatically preclude a determination that clear and convincing evidence supports a given position. *Matter of J.L.*, 277 Mont. at 290, 922 P.2d at 462. We do not "substitute [our] evaluation of the evidence for that of the trial court, or pass upon the credibility of witnesses." *Matter of J.L.*, 277 Mont. at 290, 922 P.2d at 462 (citation omitted). Moreover, notwithstanding, the clear and convincing evidence standard in the district court, we determine only whether that court's findings are clearly erroneous and, if not, the findings must be upheld. *Matter of J.L.*, 277 Mont. at 290, 922 P.2d at 462 (citation omitted). Against this backdrop, we turn to the challenged findings and Sada's contentions, beginning with a review of the record to determine, first, whether the District Court's finding that Sada substantially failed to successfully complete or meet the goals of a treatment plan approved by the court is supported by substantial evidence.

21. ¶ Primary requirements in each of Sada's four treatment plans were to complete a valid chemical dependency evaluation, follow through with the recommendations of the chemical dependency counselor for aftercare and attend AA and NA meetings as recommended. Sada obtained a chemical dependency evaluation and attended two separate treatment programs. However, according to her own testimony, she has not regularly attended AA or NA; nor has she followed through with the aftercare recommended following both treatment programs. Indeed, shortly after completing the intensive outpatient treatment, Sada overdosed twice--once on "laced" marijuana and once on anti-depressants--and was hospitalized. Moreover, while Sada conceded that she must resolve her chemical dependency if she wants to regain custody of J.M. J., she testified that she has not attempted to do so except to the extent of discovering that treatment and aftercare cannot be resumed until she obtains a current chemical dependency evaluation.

22. ¶ Sada's treatment plans also required her to obtain a psychological evaluation and follow through with any recommendations made by the evaluating psychologist. Sada obtained a psychological evaluation which indicated she was emotionally incapable of caring for J.M.J., describing her as narcissistic and defiantly oppositional, and recommended a course of treatment. Sada did not pursue the recommended treatment as required by her treatment plans.

23. ¶ Sada also agreed in her treatment plans to maintain an adequate home with proper utilities and acceptable cleanliness, free of drugs and alcohol, and with only immediate family members residing in it. At the time of the hearing, Sada was living with another boyfriend and testified that she did not contact DPHHS for the

seven months prior to the hearing because, for at least the first five or six months, she was not in "stable housing." On this record, we conclude that the District Court's finding that Sada substantially failed to successfully complete or meet the goals of a treatment plan approved by the court is supported by substantial evidence.

24. ¶ Sada asserts, however, that her testimony regarding the actions she took in the seven months prior to the hearing--including that she was no longer in an abusive relationship, led a sober lifestyle, and took anti-depressive medication--supports the opposite result. Her assertion, however, ignores our standard of review, which is not whether evidence of record would support a different finding. Our standard is whether substantial evidence supports the District Court's findings of fact (*see In re S.M.*, ¶ 15) and, in making that determination, we do not substitute our judgment regarding the weight of the evidence for that of the trial court. *Matter of J.L.*, 277 Mont. at 290, 922 P.2d at 462.

25. ¶ With regard to the District Court's finding that the conduct or condition that renders Sada unfit to parent J.M.J. is unlikely to change within a reasonable time, Sada urges that her testimony regarding the seven months prior to the hearing demonstrates that she is likely to make the necessary changes in her life within a reasonable time and, in fact, has already done so. Sada highlights her current situation, in which she is not in an abusive relationship, leads a sober lifestyle, takes anti-depressant medication, has maintained a job for five months and has improved her education.

26. ¶ We agree that Sada made positive changes in her life in the months preceding the hearing. However, J.M.J. had been in DPHHS' custody for over 20 months by the time of the hearing and Sada still had not completed any of her four court-approved treatment plans. Moreover, Sada's testimony established that she obtained "stable housing" only one or two months before the hearing. In addition, she maintained no contact with her social worker during the seven months prior to the hearing. Finally, Sada testified that she would like to be J.M.J.'s mother and take care of him, but she was unsure when she would be able to do so and she did not have a specific timetable or plan for completing her court-approved treatment plans. On this record, we conclude that the District Court's finding that the conduct or condition that renders Sada unfit to parent J.M.J. is unlikely to change within a reasonable time is supported by substantial evidence.

27. ¶ We hold that substantial evidence supports the District Court's findings that Sada failed to complete or meet the goals of her treatment plans and that the conduct and condition rendering her unfit to parent J.M.J. is unlikely to change within a reasonable time are supported by substantial evidence and the findings are not

otherwise clearly erroneous.

28. ¶ **2. Did the District Court abuse its discretion in terminating Sada's parental rights when a less restrictive alternative existed?**

29. ¶ Sada contends that, even if we conclude--as we have above--that the District Court's findings under § 41_3_609(1)(c), MCA (1995), are not clearly erroneous, the District Court abused its discretion in terminating her parental rights because a less stringent alternative--long-term custody and guardianship--was available. Her argument is premised on the principle stated in *In re E.W.*, 1998 MT 135, ¶ 12, 289 Mont. 190, ¶ 12, 959 P.2d 951, ¶ 12, that parental rights are a fundamental liberty interest and, therefore, her rights can be restricted only to the extent necessary to protect J.M.J. In response to DPHHS' contention that the constitutional issue is not properly before us because Sada did not raise it in the District Court, she asserts that the issue was raised sufficiently when 1) DPHHS' opening statement noted Sada's desire to at least maintain her parental rights via only permanent custody of J.M.J. in DPHHS; 2) a DPHHS social worker supervisor testified about the difference between permanent guardianship or custody and termination of parental rights; and 3) Sada's inclusion of a conclusion that parental rights are a fundamental right and should not be terminated unnecessarily in her proposed findings of fact and conclusions of law submitted three weeks after the hearing. We disagree.

30. ¶ DPHHS' opening statement merely acknowledged that, while Sada was contesting termination of her parental rights to J.M.J., she hoped for a "worst case" scenario limited to permanent custody of J.M.J. by DPHHS, rather than a termination of her parental rights awarding DPHHS legal custody of J.M.J. with the right to consent to adoption. Moreover, the supervisor's testimony regarding the differences between terminating parental rights and long-term custody with a permanent guardianship related to DPHHS' position that it was in J.M.J.'s best interest for Sada's parental rights to be terminated. Finally, although Sada's proposed conclusion of law asserted her fundamental right to parent J.M.J., it did not challenge the constitutionality of terminating that right in this case, thereby placing the issue squarely before the District Court for resolution.

31. ¶ As a general rule, we do not consider an issue presented for the first time on appeal because "it is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Unified Industries, Inc. v. Easley*, 1998 MT 145, ¶ 15, 289 Mont. 255, ¶ 15, 961 P.2d 100, ¶ 15 (citation omitted). In this case, the District Court received evidence regarding what each party believed was in J.M.J.'s best interest, but Sada did not present the issue of the constitutionality of terminating her parental rights to the District Court

for resolution. We conclude, therefore, that the issue of the constitutionality of terminating Sada's parental rights when a less restrictive alternative was available was not before the District Court, and we decline to address it further. *See In re S. M.*, ¶ 32.

32. ¶ Sada also advances an equitable argument for permanent guardianship rather than termination of her parental rights. She contends that if Karen is permitted to adopt J. M.J., Jade will have more rights than she will because he will still have a relationship--albeit as a brother--to J.M.J., and he has made less effort to become a suitable parent than she has. The District Court specifically questioned the social worker supervisor in this regard and entered a finding of fact summarizing her explanation of why termination of parental rights was in J.M.J.'s best interest.

33. ¶ Sada does not challenge the court's finding. Furthermore, it is well established that the best interests of the child are paramount in a termination of parental rights action and take precedence over parental rights. *See, e.g., Matter of C.M.,* 281 Mont. at 187, 932 P.2d at 1066; *Matter of J.J.C.H.* (1992), 252 Mont. 158, 165, 827 P.2d 812, 816; *In re J.W.* (1988), 232 Mont. 46, 50, 757 P.2d 769, 771.

34. ¶ We hold the District Court did not abuse its discretion in terminating Sada's parental rights.

35. ¶ Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ J. A. TURNAGE

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ JIM REGNIER