No. 01-156

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 285

IN THE MATTER OF B.B.,

Youth in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Patrick E. Kenney, Attorney at Law, Billings, Montana

For Respondent:

Connie Camino, Attorney at Law, Billings, Montana

Submitted on Briefs: July 26, 2001
Decided: December 20, 2001

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the Opinion of the Court.

¶1 The guardian ad litem, Patrick E. Kenney, appeals the decision of the District Court for the Thirteenth Judicial District, Yellowstone County, to dismiss the Department of Public Health and Human Services' petition to terminate the parental rights of Stacey, the natural mother of B.B. The guardian ad litem also appeals the District Court's denial of a motion for emergency stay filed after entry of judgment. We affirm the judgment and order of the District Court.

¶2 The following issues are raised on appeal:

¶3 1. Are the District Court's findings of fact clearly erroneous?

¶4 2. Did the District Court err when it sustained an objection to Dr. Veraldi's testimony about the effects of a personality disorder on parenting?

¶5 3. Did the District Court err when it denied the guardian ad litem's motion to set aside the judgment based on newly discovered evidence?

## FACTUAL BACKGROUND

¶6 During 1997, Stacey became heavily involved in the use of illegal drugs, particularly methamphetamine, and related criminal activity. Prior to October 1997, Stacey, who was born in 1966, had no criminal history. Stacey was convicted of three criminal offenses in San Diego County between 1998 and 1999. On June 1, 1998, she was convicted of receiving stolen property. On January 7, 1999, she was convicted of petty theft. Sometime after January 1999, she was convicted of resisting an officer. Stacey's convictions were apparently linked to her drug use and resulted in a jail sentence and sentence to a treatment center. It was during this time that Stacey established a relationship with James, B.B.'s natural father. He was Stacey's apparent drug supplier and a drug user himself.

¶7 Stacey was involved with James for the two years prior to B.B.'s birth. Stacey left California sometime before April 2, 1999, while on probation and in a chemical dependency treatment program, and while she was pregnant with B.B. She arrived in Yellowstone County by bus on approximately April 2, 1999.

¶8 Upon her birth on April 30, 1999, B.B. tested positive for methamphetamine. Stacey concealed her identity during the birth of B.B., used an alias at the hospital, furnished incorrect information for B.B.'s birth certificate, failed to furnish information about the

father, and gave inaccurate information to hospital staff and social workers. B.B. was removed from Stacey's care at the hospital and placed into foster care.

¶9 Stacey was taken to Rimrock Foundation for detoxification after her release from the hospital. Stacey then enrolled at Cedar Mountain Center, a treatment center in Cody, Wyoming. Stacey successfully completed a treatment program at Cedar Mountain which lasted for approximately thirty days.

¶10 On May 5, 1999, DPHHS filed a petition for temporary investigative authority and protective services for B.B. The original show cause hearing took place on June 11, 1999, following which the order for protective services was maintained. Stacey met with the assigned social worker at the time of the hearing and stated her desire to go to a half-way house located near her grandmother in Des Moines, Iowa. She had been raised and educated in Iowa. The social worker suggested that she stay at the Women and Family Shelter in Billings, and asked that she call on June 14, 1999, to set up a visit with B.B. However, Stacey had no job or means of transportation. Furthermore, she had no family, friends, or support system in Billings. Given her circumstances, Stacey took a bus to Iowa on the weekend of June 11, 1999. Upon her departure, Stacey had been in Montana for approximately two months from arrival to departure.

¶11 For a month and a half after arriving in Iowa, Stacey lived at a half-way house, the Beacon of Life. Stacey was employed at the Comfort Inn. Stacey continued her aftercare program and attended parenting classes. In a letter dated July 8, 1999, Stacey made the first of repeated requests for an interstate compact between Montana and Iowa to place B.B. in foster care in Iowa. DPHHS denied these requests throughout most of the proceedings, insistent that Stacey show progress on her treatment plan and fearful of the effect of B.B.'s removal from her Montana foster home. DPHHS felt Stacey should move back to Montana and work through her treatment plans, repeatedly offering her one-way bus tickets.

¶12 Stacey reunited with B.B. for the first time in December of 1999 when she returned for the temporary custody hearing. Because Stacey requested the case be moved to Iowa, and DPHHS insisted the case remain in Montana, Stacey did not see B.B. during the first seven months of her life. Stacey had an extensive visit with B.B. for a five-day period in January 2000. In February 2000, after learning that DPHHS intended to file a petition to terminate her parental rights, Stacey again visited B.B., this time for approximately three days.

¶13 On February 7, 2000, DPHHS filed its petition to permanently terminate Stacey's parental rights. Stacey agreed to return to Billings at the request of DPHHS to complete her treatment plan and to further develop her bond with B.B. Stacey moved back to Billings on March 11, 2000. Stacey stayed in Montana through May 22, 2000. During that time, Stacey maintained employment, first at the Rimview Inn, then at the Sheraton Hotel. Stacey had significant visitation with B.B., both at public places and at her home. When visitation was at its greatest frequency, Stacey was able to see B.B. for approximately thirty hours per week.

¶14 With the exception of missing one urinalysis test (which she contends was an oversight), Stacey also appeared to be in compliance with her treatment plan and participated in services offered by DPHHS. Stacey was evaluated by several specialists, including a social worker and a clinical psychologist.

¶15 Eventually DPHHS received a report which alleged that B.B. was returned to her foster parents with "poopy" diapers and a dirty face. There was evidence that at times during visits with B.B., Stacey would sleep and that B.B. was not properly fed. Finally, B.B.'s foster parent reported to DPHHS that she saw an individual matching the description of James at Stacey's door. With that information, DPHHS decreased visitation to approximately three hours per week and only in the presence of someone from DPHHS. Stacey then decided to return to Iowa.

¶16 The District Court held hearings to consider DPHHS' petition for parts of six days: June 28, August 1, August 2, September 5, September 6, and October 2, 2000. On October 31, 2000, the District Court made its Findings of Fact and Conclusions of Law and dismissed DPHHS' petition. Furthermore, it ordered B.B. be returned to the care of Stacey within a period of thirty days. The District Court found that, with the exception of her outstanding criminal issues in California, Stacey had substantially complied with her treatment plan.

¶17 After the notice of entry of judgment was served on the parties on November 8, 2000, DPHHS and the guardian ad litem filed a joint notice of appeal on November 14, 2000. The parties also filed separate motions to stay judgment and the guardian ad litem moved to set aside the judgment based on newly discovered evidence. The District Court denied both motions on December 4, 2000. The guardian ad litem filed a separate notice of appeal from the post-judgment order on December 15, 2000. On December 19, 2000, DPHHS withdrew its appeal of the October 31, 2000, judgment of the District Court.

## STANDARD OF REVIEW

¶18 In termination of parental rights cases, we review a district court's findings of fact to determine whether they are clearly erroneous. *In re J.M.J.*, 1999 MT 277, ¶ 15, 296 Mont. 510, ¶ 15, 989 P.2d 840, ¶ 15. A finding of fact is clearly erroneous if it is not supported by substantial evidence, the district court misapprehended the effect of the evidence, or a review of the record leaves us with the definite and firm conviction that the court made a mistake. *J.M.J.*, ¶ 15.

¶19 We review a district court's limitations on cross-examination for an abuse of discretion. *State v. Gallagher* (1978), 177 Mont. 150, 159, 580 P.2d 930, 935.

¶20 The denial of a post-judgment motion for an emergency stay is within the district court's discretion and, therefore, will also be reviewed for an abuse of discretion. *Sourdough Protective Ass'n, Inc. v. Board of County Comm'rs of Gallatin County* (1992), 253 Mont. 325, 327, 833 P.2d 207, 208. The test for abuse of discretion is whether the district court acted arbitrarily without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice. *J.M.J.*, ¶ 16.

## DISCUSSIONISSUE 1

¶21 Are the District Court's findings of fact clearly erroneous?

¶22 The District Court in this case made extensive findings of fact and Appellant claims that several were clearly erroneous. Specifically, Appellant contends that the District Court either made findings without sufficient evidence or misapprehended the effect of the evidence. Appellant contests Findings 18, 10, 15, 16, and 17. We will address each finding in turn.

¶23 In Finding No. 18, Appellant asserts that the District Court misapprehended the effect of the evidence when it found that the evidence *suggested* Stacey had a personality disorder, as opposed to a finding that Stacey in fact had a personality disorder. Finding No. 18 provides in part:

> Psychologist Ned Tranel conducted a psychological evaluation of Stacey on May 9, 2000. Mr. Tranel had no written report of his findings. In his testimony, he indicated that Stacey's profile suggested a borderline personality disorder. The Court was

unclear concerning whether that was an actual diagnosis or just a suggestion of a condition which he found.

The District Court's finding reflects Dr. Tranel's testimony at trial:

> Q: Did you find any evidence of any sort of personality disorders?
>
> A: Yes, the profile *suggests* a borderline personality disorder. The hallmark of that is a fear of abandonment, a panic like response to the possibility of being left alone, and that leaves her quite vulnerable to forming relationships without proper scrutiny and without proper assessment of the risks involved. So she's still handicapped by that fear of being abandoned and left alone. [Emphasis added.]

Dr. Tranel's testimony about the personality disorder was exactly as characterized in the District Court's findings. Therefore, we conclude that finding was not clearly erroneous.

¶24 Appellant similarly contends that the District Court erred in Finding No. 18 when it found that Dr. Tranel's recommendation to terminate Stacey's parental rights was based primarily on bonding issues. The court found:

> Much of Mr. Tranel's testimony related to bonding issues between B.B. and the foster parents and his opinion concerning bonding issues between B.B. and Stacey. Mr. Tranel did not observe Stacey with the child although the reason that did not occur may have been because Stacey left Billings in May of 2000 before the observation could be made. . . . *Primarily* based on bonding issues, Mr. Tranel has recommended that the child not be returned to Stacey. This evidence is not persuasive. [Emphasis added.]

Following Dr. Tranel's discussion of his psychological evaluation of Stacey, the remainder of his testimony during direct examination centered on bonding issues. Among the topics of discussion were B.B.'s bond to her foster parents, the importance and development of bonds, and the potential transferability of bonds from B.B.'s foster parents to Stacey. The extent of the bonding testimony was sufficient to support the District Court's finding. Furthermore, the Court's finding was that Dr. Tranel's recommendation was *primarily* based on bonding issues, not *exclusively* based on bonding issues. We agree that other issues cited by Appellant, such as Stacey's evaluation, her level of sobriety and associated denial and minimization, and her ability to change, may have been influential. But the

record contains substantial evidence for a finding that Dr. Tranel's recommendation was primarily based on bonding issues and we conclude that the finding is not clearly erroneous.

¶25 Appellant next contests the District Court's finding that the proceedings should have been transferred to Iowa. Finding No. 10 provides:

[I]t would be logical that Stacey be in Iowa where she had spent much of her life, where her family members and friends lived, where she had attended college, where she spent her early years of married life and where she had an apparent better ability to earn income than in Montana.

Stacey testified that she wanted to go back to Iowa because that is where she had family, a support network, and the best chance to beat her addiction. She referred to Iowa as "home." She had the following to say about moving back to Iowa after treatment in Billings:

Q: And why did you want to go back to Iowa?

A: Because I didn't know what to do and I didn't know where I was going to stay and I didn't know where I was going to live and I had no money and I hadn't had no one to help me and I didn't know what else to do.

Q: What do you think would have happened to you if you'd stayed in Billings?

A: I have no idea. Would have had to stay at the mission.

Q: Were you afraid of relapsing at that point?

A: Well, I had no support system there. I mean if anybody's ever stayed at the mission, that place is the dumpiest place in the world and all kinds of scary people are around there and I wasn't getting support from anybody. I didn't know what to do and that's why I asked my grandma to send me home.

Q: When you went back to Iowa, what were you thinking about as far as contact with [B.B.]?

A: Well, I was hoping that I could get the case transferred to Iowa, now that I had

moved back to Iowa, and that maybe they could set her up in foster care in Iowa while I completed my - whatever they wanted me to do.

We conclude that the District Court had substantial evidence to support Finding No. 10 and that the finding is not clearly erroneous.

¶26 Next, Appellant contends that the District Court misapprehended the effect of evidence in Finding No. 16 where it found that at the time of trial, B.B. had bonded better with her foster parents than with Stacey. It appears that Appellant would have preferred a finding focusing on the lack of bonding between Stacey and B.B., rather than a finding that B.B. had bonded better with her foster parents. However, the difference is semantic and unimportant to the outcome at any rate. The District Court concluded Finding No. 16 by stating that its finding that B.B. had bonded better with her foster parents was not determinative in its conclusion. Therefore, we move to the next contested finding.

¶27 The guardian ad litem challenges that part of Finding No. 15 where the court found that "there is no evidence that Stacey wanted to do anything except keep James out of her life." While there was conflicting circumstantial evidence, there was no direct evidence in the record that James and Stacey had ongoing communications. Appellant's contentions that ongoing communications between James and Stacey could be presumed because Stacey did not obtain a restraining order against James and because Stacey had maintained contact with James' brother prior to James coming to Billings are speculative and not based on direct evidence. Stacey testified that she wanted nothing to do with James, assuming his lifestyle was as it had been in California. She testified as follows:

> Q: Well, if you had taken B.B. home from the hospital and raised her, would you have allowed him [James] to see her?

> A: It depends on what he would have done. I mean - I mean if he would continue in the same lifestyle as he was doing when I was in California, hell no. That's why I left.

Another contention that James was sighted by the foster mother at Stacey's door was based on the following testimony which was equivocal at best:

> Q: So for all you know, that might not have been James?

A: For all I know it might not have been. For all I know it might have been.

Therefore, we conclude that Finding No. 15 is not clearly erroneous.

¶28 Appellant contests several portions of Finding No. 17, which addresses Stacey's compliance with, and the success of, her treatment plan. After reviewing the guardian ad litem's brief, it appears he is contesting several subsections of the finding, as well as the overall finding that Stacey had substantially complied with her treatment plan. We will discuss the subsections first, followed by the overall finding.

¶29 Subsection (b) discusses Stacey's treatment plan goal to increase her parenting abilities. Appellant contends that the District Court's finding that there was no pattern of behavior that indicated Stacey was an inappropriate caretaker was clearly erroneous. In subsection (b), the District Court recited several "isolated instances" of poor parenting decisions, including sending B.B. back to the foster mother with dirty diapers, returning B.B. in an unclean condition, and sleeping during visitation. However, the District Court found that such isolated instances did not equate to a pattern of poor parenting. We agree. Without a more extensive pattern, the record supports the District Court's finding.

¶30 Appellant also contests the finding in subsection (b) that Stacey's parenting abilities are adequate when she is not using illegal drugs, based on his contention that Stacey had a borderline personality disorder. However, because of our previous determination that the District Court did not err when it found that a personality disorder was merely *suggested*, Appellant's argument is without merit. Furthermore, the record indicates that Stacey was an effective parent of her two older children prior to her increased drug use in 1997.

¶31 Subsection (c) of Finding No. 17 discusses Stacey's treatment plan goal to provide a safe and healthy environment for B.B. The District Court found:

> One of the tasks that the Department has requested in the treatment plan of Stacey related to the providing of an appropriate environment for children was for Stacey to address her legal issues. The Department has requested that Stacey return to California to address those problems. Stacey has an attorney in California with the Public Defender's Office. Stacey testified that she believes through that attorney that those proceedings will be resolved appropriately in a manner not requiring incarceration when she furnishes proof of her chemical dependency treatment and aftercare. The matter has not yet been resolved. California apparently does not

intend to extradite Stacey to California. This is the one area of the treatment plan where there has not been compliance but is not itself a basis to terminate parental rights.

Appellant accuses the District Court of minimizing or overlooking the fact that Stacey failed to complete a portion of her treatment plan. We disagree. The District Court did not "overlook" the outstanding criminal issues, but acknowledged them, was assured they were being addressed, and looked at the criminal issues as but one aspect of a comprehensive treatment plan toward which Stacey had made successful progress in a reasonable period of time. Therefore, we conclude that the District Court's Finding No. 17 was not clearly erroneous.

¶32 As a final matter, Appellant contends that the District Court erroneously found that Stacey substantially complied with her treatment plan. However, the District Court was thorough in its analysis, made findings pertaining to each goal within the treatment plan, and summarized the completion of the treatment plan based upon those findings. It stated up front that Stacey had not accomplished all of the treatment plan tasks. Nevertheless, the Court was satisfied that Stacey had substantially complied with the plan as a whole, that the plan was successful, and that she could provide adequate care for B.B. In substantiating its determination, the District Court contrasted Stacey's life at the time of B. B.'s birth with her life at present. It found that much of DPHHS' concerns related to Stacey's use of aliases, her association with inappropriate individuals, her ability to be an appropriate caretaker, and her drug use, and that those matters had been addressed. At the time of trial, Stacey was employed, lived in a healthy home environment, had participated in parenting classes and aftercare, and had proved to be drug-free since B.B.'s birth. While the Court recognized that bonding issues remain, the Court attributed the lack of bonding to date to Stacey's presence in Iowa while B.B. was in Montana, rather than an inability to bond. We conclude that the District Court's finding that Stacey has substantially complied with her treatment plan is based on substantial evidence and is not clearly erroneous.

## ISSUE 2

¶33 Did the District Court err when it sustained an objection to Dr. Veraldi's testimony about the effects of a personality disorder on parenting?

¶34 Appellant contends that Dr. Veraldi should have been allowed to testify about the effects of a personality disorder on parenting, based on the fact that Stacey's counsel

opened the door to such testimony. Because Dr. Veraldi was asked about opinions that could be made based on her evaluation, and Dr. Veraldi's response that she would talk about personality and cognitive features and limitations, Appellant contends it should have been allowed on cross-examination to inquire into the effects of a personality disorder on parenting. The District Court sustained Respondent's objection to such an inquiry as beyond the scope of direct examination.

¶35 The latitude of cross examination is at the discretion of the trial court, and this Court will not interfere unless there is an abuse of discretion. *State v. Gallagher* (1978), 177 Mont. 150, 159, 580 P.2d 930, 935. We conclude there was no abuse of discretion here. Following the objection by Stacey's counsel, the Court asked Dr. Veraldi:

> Q: Do you have any diagnosis of her [Stacey] with borderline personality disorder?
>
> A: I don't from my own data.

Upon hearing that counsel was to discuss how a borderline personality disorder affects parenting, the Court explained its ruling:

> Well, I guess what bothers me, that is outside the scope of his direct. His direct is related to this one incident here [a two hour observation of the interaction between Stacey and B.B.]. Are you calling her as a witness now to bolster - I'll sustain the objection. I'm going to do it on the basis it exceeds the scope of the direct examination. It has nothing to do with this report [Dr. Veraldi's evaluation summary].

Because Dr. Veraldi's direct examination centered on her observation of Stacey with B.B., and Dr. Veraldi had not diagnosed Stacey with a borderline personality disorder, the District Court did not abuse its discretion.

## ISSUE 3

¶36 Did the District Court err when it denied the guardian ad litem's motion to set aside the judgment based on newly discovered evidence?

¶37 On November 29, 2000, the guardian ad litem filed a motion for an emergency stay and requested a hearing based on newly discovered evidence. With the motion, the guardian ad litem attached eight affidavits with information it alleges was discovered after DPHHS filed its notice of appeal. The basis for the guardian ad litem's motion is unclear. The motion could be construed as a Rule 59, M.R.Civ.P., motion for a new trial, or a Rule 60(b)(2), M.R.Civ.P., motion to set aside the judgment based on newly discovered evidence. However, as the District Court correctly found, if the motion was filed pursuant to Rule 59, M.R.Civ.P., it was late. The motion was filed on November 29, 2000, when the ten-day deadline for filing a motion for a new trial would have required the motion to be filed before November 27, 2000. Therefore, we will review the guardian's motion as a Rule 60(b)(2), M.R.Civ.P., motion to set aside the judgment based on newly discovered evidence.

¶38 Rule 60(b)(2), M.R.Civ.P., provides:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).

¶ 39 The standard of review for a district court's decision to grant or deny a Rule 60(b), M.R.Civ.P., motion depends on the issues involved. When the district court engages in a discretionary appraisal or weighing of the facts to dispose of the motion, we determine whether the district court abused its discretion. *Estate of Nielsen v. Pardis* (1994), 265 Mont. 470, 475, 878 P.2d 234, 237.

¶40 Newly discovered evidence may constitute grounds for judgment relief if the following conditions are met: (1) the alleged newly discovered evidence came to the moving party after trial; (2) it was not a want of due diligence which precluded its earlier discovery; (3) the materiality of the new evidence is so great that it would probably produce a different result on retrial; and (4) the new evidence is not merely cumulative, not tending only to impeach or discredit witnesses in the case. *Fjelstad v. State, Through Dep't of Highways* (1994), 267 Mont. 211, 220-21, 883 P.2d 106, 111-12.

¶41 The guardian ad litem presented the newly discovered evidence through affidavits.

The affidavits contend, among other things, that Stacey: (1) left her apartment in poor condition with empty beer cans; (2) was evicted; (3) was fired twice from her employment; (4) was seen driving a stolen vehicle; and (5) had continued ongoing communication with James. The District Court found it "extremely unlikely that the alleged newly discovered evidence . . . could not with reasonable diligence have been discovered and produced at the time of trial." The District Court explained its denial of the guardian ad litem's motion:

> This trial was one of the hardest fought and most lengthy trials in this Court's experience involving a petition to terminate parental rights. The Department and Guardian Ad Litem seemed to leave no stone unturned concerning evidence elicited in an attempt to paint the natural mother as a bad person. It is interesting to the Court that some of this allegedly newly discovered evidence is claimed to have been discovered after the October 31, 2000, order. One would have thought, as hard fought as this case was, that incidents which occurred in or prior to early June would have been presented in Court during the course of this trial which consumed part of six days beginning June 28, 2000, and ending October 2, 2000.

¶42 The District Court was neither satisfied that the alleged newly discovered material was discovered after trial, nor that the moving party could not have discovered the information earlier by exercising due diligence. The affidavit of Frannie Fowler, the property manager of Stacey's apartment building, is a case in point. In discussing whether Stacey was evicted from her apartment, the affidavit referenced events which occurred between May 24 and June 12, 2000. Such information could have been presented prior to the conclusion of the final hearing, which ended on October 2, 2000. Furthermore, many of the individuals who provided affidavits, including Donna Veraldi, Janis Langohr, Ned Tranel, and Kim Vopel, the foster mother, testified at trial.

¶43 The District Court considered the weight of the affidavit information and did not act arbitrarily. Accordingly, the District Court did not abuse its discretion when it denied the guardian ad litem's motion to set aside the judgment based on newly discovered evidence.

¶44 The judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ KARLA M. GRAY

/S/ JIM REGNIER

/S/ JIM RICE

/S/ PATRICIA COTTER