No. 03-132

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 211

IN RE THE MARRIAGE OF
DIANE LYNNE WEBER, n/k/a DIANE LYNNE HOOKER,

      Petitioner and Appellant,

  and

GARY LEROY WEBER,

      Respondent and Respondent.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone, Cause No. DR 2002-0390
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      J. Reuss, Esq., Wright Tolliver Guthals, P.C., Billings, Montana

      For Respondent:

      George R. Radovich, Esq., Attorney at Law, Billings, Montana

Submitted on Briefs:  June 5, 2003

Decided:  August 10, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Diane Lynne Hooker (Hooker) appeals the decision of the Thirteenth Judicial District Court to re-open and amend its previously-issued Findings of Fact, Conclusions of Law, and Final Decree (Final Decree).  In the original Final Decree, Gary Leroy Weber (Weber) was ordered to pay approximately $23,000 in medical and dental bills for his former wife, Hooker.  In the amended Order, the District Court held that Weber would not be required to "pay any medical or dental expenses for [Hooker] for any period of time, whether past, present or future."  We reverse.

## ISSUE

¶2     A restatement of the dispositive issue is:

¶3     Did the District Court abuse its discretion under Rule 60(b), M.R.Civ.P., when it re-opened and amended the Final Decree?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4     Diane Hooker was in her late forties and Gary Weber was in his fifties when they married.  Their marriage lasted nearly four years.  Weber owns several companies and Hooker is a school teacher with additional means of income.  When the parties married, Weber sold his premarital home and moved into Hooker's home.  They quickly determined that it would be beneficial for Hooker to add Weber to her employer-provided medical insurance plan and for Weber to cease medical coverage through his corporations.  It is undisputed that, as a result of this arrangement, Weber agreed to pay all non-covered medical expenses.

2

¶5    Over the course of what appears to have been a rocky marriage, Weber's payment of non-covered medical expenses was erratic. Nonetheless, in September 1999, when Hooker was told she required extensive and expensive dental work, Weber encouraged her to proceed, claiming that he would be responsible for the non-insured portion of the cost of the treatment. Hooker began the treatment in November 1999.

¶6    In spring 2001, Weber petitioned to dissolve the marriage and in September 2001, Hooker removed him from her employer-provided medical insurance plan. In October 2001, Weber reinstated his medical insurance coverage through one of his corporations. The couple later reconciled but in April 2002, Hooker filed for divorce. The dissolution trial was held on September 25, 2002. By this time, Hooker's dental treatment had progressed to the stage of Hooker having temporary tooth implants. The doctor estimated it would be several more months before the permanent implants would be ready for placement. The estimated cost for the remaining work would be at least $15,000 but Hooker had not yet been billed for that amount.

¶7    The District Court's November 27, 2002, Final Decree dissolved the marriage and distributed the assets and liabilities between the parties. Among the liabilities allocated to Weber was $23,233 for Hooker's dental treatment.

¶8    After the trial, Weber called Hooker's dentist to arrange for payment of Hooker's bill. He was told that the bill was current at that time and that no further expenses would accrue on the account until the next phase of the treatment was underway, possibly several months later. On December 9, 2002, twelve (12) days after the entry of the Final Decree, Weber

moved the District Court to re-open the Final Decree on the grounds that Hooker committed perjury and fraud on the court by claiming that she had an outstanding bill due with the dentist, and by claiming that she continued to carry Weber on her employer-provided medical insurance plan. Weber filed two affidavits with the District Court claiming to have learned *after* the trial that Hooker had stopped insuring him as of September 2001, and that such revelation constituted newly discovered evidence.

¶9 A post-dissolution hearing was held on December 18, 2002, at which an employee with Hooker's dentist testified that Hooker's treatment was incomplete and that it was going to take several more months before Hooker's permanent teeth could be implanted. She further explained that Hooker would not be billed until the next phase of the treatment began but that the estimated remaining treatment costs were at least $15,000.

¶10 Weber testified that he knew at the time of trial that Hooker had taken him off of her insurance in September 2001, and that he had reinstated his coverage through one of his corporations in October 2001. He also admitted that he had discovered no new information about the insurance coverage that he did not know at the time of trial. Weber claimed to have agreed to pay Hooker's dental treatment through the placement of her permanent implants but said he believed Hooker had achieved that goal by the time of the September dissolution trial. He indicated that he did not want to be responsible for ongoing maintenance costs after the final implants were in place.

¶11 As to the insurance question, Hooker testified that when her attorney asked if Weber's insurance premiums "are" automatically deducted from her paycheck, she responded using

4

the same verb–she stated, "Yes, they are." She maintained that she merely used the same verb as her attorney and that she should have used the verb "were."

¶12 At the close of the post-dissolution hearing, the court ruled from the bench that the Final Decree would be amended because the "Court was misled by the wife's testimony at trial." The District Court ruled that Weber was "not responsible for any of the wife's medical or dental bills whatsoever now or in the future."

¶13 Hooker filed a timely appeal.

## STANDARD OF REVIEW

¶14 The standard of review for a district court's decision to grant or deny a Rule 60(b), M.R.Civ.P., motion depends on the issues involved. When the district court engages in a discretionary appraisal or weighing of the facts in a particular case, we review the district court's decision for an abuse of discretion. *In Re B.B.*, 2001 MT 285, ¶ 39, 307 Mont. 379, ¶ 39, 37 P.3d 715, ¶ 39.

DISCUSSION

¶15    It is well-established that a court may re-open a previously-issued decision or order under certain grounds.  Section 40-4-208(3)(b), MCA, states that the provisions of a property disposition may not be revoked or modified by a court except if the court finds the existence of conditions that justify the re-opening of a judgment under the laws of this state.

¶16    Weber moved the District Court to re-open and amend the Final Decree on the Rule 60(b) grounds of "fraud on the court" or "newly discovered evidence."  Because we do not know upon which ground the District Court granted the Motion, we will discuss both grounds.

¶17    Rule 60(b), M.R.Civ.P., provides the circumstances under which a court may re-open, set aside or amend a final judgment or order.  In the Brief in Support of his Motion, Weber specifically relied upon Rule 60(b)(2) and (3), M.R.Civ.P, which provide:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons:
>
> . . .
>
> (2)  newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3)  fraud (whether heretofore denominated intrinsic or extrinsic), mis-representation, or other misconduct of an adverse party; . . .

¶18    Neither of these provisions, however, are applicable to a "fraud on the court" claim. We noted in *In Re Marriage of Hopper*, 1999 MT 310, 297 Mont. 225, 991 P.2d 960, that "an independent equitable action to set aside a judgment for fraud on the court may be

entertained *only* under the residual clause of Rule 60(b), M.R.Civ.P." (Emphasis added.)

The "residual clause" provides:

> This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified as may be required by law, or to set aside a judgment for fraud upon the court.

¶19    Thus, there are three grounds for obtaining relief from a judgment under the residual clause of Rule 60(b), M.R.Civ.P.:  extrinsic fraud, lack of personal notification, and fraud upon the court.  Extrinsic fraud will be discussed below.  Lack of personal notification is not applicable to this case.  We now turn to "fraud on the court" which Weber alleged was committed by Hooker.

¶20     Fraud on the court, as we explained in *Falcon v. Faulkner* (1995), 273 Mont. 327, 332, 903 P.2d 197, 200 (citation omitted),

> should, . . ., embrace only that species of fraud which does or attempts to subvert the integrity of the court itself, or is fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner in its impartial task of adjudicating cases that are presented for adjudication. Relief should be denied in the absence of such conduct.

In *Falcon*, we cited the following examples of fraud upon the court: bribery, evidence fabrication, and improper attempts to influence the court by counsel.  *Falcon*, 273 Mont. at 332, 903 P.2d at 200.  We also pointed out that fraud on the court "must be such fraud as denied the adversary an opportunity to have a trial or to fully present his side of the case. . . ."  *Falcon*,  273 Mont. at 332, 903 P.2d at 200.  Moreover, in *In Re Marriage of Miller*

7

(1995), 273 Mont. 286, 292, 902 P.2d 1019, 1022 (citations omitted), we repeated that "fraud between the parties or perjury at trial is not fraud upon the court."

¶21 Weber maintains that during the dissolution trial, Hooker committed perjury and fraudulently testified that she was still paying Weber's premiums through a paycheck deduction. Weber relies exclusively on the following dialogue:

Attorney: Okay. Now, I think you testified to this, that the premiums for Gary being added to your policy, those are by automatic deduct out of your paycheck?

Hooker: Yes, they are.

We note, however, that during the trial, Hooker also stated, using the past tense form of the verb, that she "*paid* the premium out of a salary deduct from my wages."

¶22 Hooker's testimony did not deny Weber "an opportunity to have a trial or to fully present his side of the case." *Falcon*, 273 Mont. at 332, 903 P.2d at 200. The record does not reveal why Weber did not challenge Hooker's statement during cross-examination, but the record is clear that Weber knew at the time the statement was made that Hooker had stopped paying premiums for his insurance coverage a full year before the trial. While Weber's two affidavits seeking amendment of the Final Decree disingenuously led the court to believe that he discovered *after* the dissolution trial that Hooker had stopped paying his premiums, his testimony at the post-trial proceeding clearly revealed otherwise:

Attorney: You knew at the time of trial that your wife had taken you off her insurance, didn't you?

Weber: Yes, I did.

Attorney: And you secured your own insurance, didn't you? Prior to the trial?

8

Weber:        Right.

When asked when Hooker stopped paying his premiums, he agreed that it had been over two years earlier.

¶23   Because Weber knew that Hooker was not paying his premiums at the time of the dissolution trial, Hooker's response to her attorney's inartful question did not deny Weber the opportunity to have a trial or to fully present his case.

¶24   We conclude that Hooker's inaccurate use of the present tense to respond to a question asked in the present tense does not constitute fraud on the court.  If the District Court re-opened and amended the Final Decree on the ground of fraud on the court, we conclude this would be an abuse of discretion.  However, because Rule 60(b)(3), M.R.Civ.P., as cited by Weber, provides for amending a judgment on other grounds relating to fraud, we will now address extrinsic and intrinsic fraud.

¶25   The terms "extrinsic" and "intrinsic" fraud do not lend themselves to simple and discrete formulas or definitions.  We must closely examine the facts in each case to identify and classify fraud as extrinsic or intrinsic.  We have generally defined extrinsic fraud "as some intentional act or conduct by which the prevailing party has prevented the unsuccessful party from having a fair submission of the controversy." *Miller*, 273 Mont. at 292, 902 P.2d at 1022 (citation omitted).  In the case before us, there is nothing in the record indicating that Hooker intended to mislead Weber into believing she was continuing to pay his premiums.  In fact, as we noted above, Weber was well aware that Hooker had ceased paying the

premiums quite some time earlier. Therefore, Hooker's statement did not prevent Weber from "having a fair submission of the controversy," and as such, is not extrinsic fraud.

¶26 Intrinsic fraud, on the other hand, has generally been defined as "false or fraudulent representations or concealments made during court proceedings." *Miller*, 273 Mont. at 292-93, 902 P.2d at 1023. Because every inartful question or inartful response does not constitute fraud, it is on occasion necessary to look at the policy behind Rule 60(b), M.R.Civ.P., to determine if a specific circumstance justifiably qualifies as fraud. As we noted in *Hopper*,

> There must be some point at which litigation ends and the respective rights between the parties are forever established. Thus, because of the public policy underlying the finality of judgments, 'courts look with a jealous eye upon suits which have for their object setting aside a judgment at law . . . .' Rule 60(b), M.R.Civ.P., constitutes an exception to the doctrine of finality of judgments. However, the rule is designed to be applied primarily as an exception to the finality of a judgment *where a party was wronged through no fault of its own. Where a party fails to but could have submitted evidence in support of its claim or defense, that party's 'desire to retroactively argue a factual issue in the case' is not a sufficient reason justifying the setting aside of a judgment.*

*Hopper*, ¶ 29 (emphasis added; internal citations omitted).

¶27 As previously noted, Weber knew long before the dissolution hearing that Hooker had stopped paying his premiums. In fact, he had already secured alternative coverage. Moreover, Weber made no objection at trial when Hooker made her alleged "misrepresentation." Weber had an affirmative obligation, if he interpreted Hooker's

10

statement to mean that she was continuing to pay his premiums at the time of trial, to rebut such statement, or impeach Hooker during cross-examination. Weber failed to do either. Moreover, our review of the record and transcript reveals no intent by Hooker to mislead the court. We conclude that Hooker's attorney asked a deficient question to which Hooker responded, also deficiently. This brief colloquy simply did not rise to the level of fraud given that Weber was not misled by the response nor was he deprived of the opportunity to rebut the statement or to present his case. Moreover, Weber admitted at the post-dissolution hearing that he had no new evidence.

¶28    Furthermore, given that Weber intentionally misled the District Court in two affidavits implying that he did not know until after the trial that Hooker had ceased paying his insurance premiums, when the contrary was true, Weber should not be allowed to benefit from his intentional misrepresentation.

¶29    As for Weber's claim of newly discovered evidence, we conclude it is without merit. Weber claimed that he did not learn until after the dissolution trial that Hooker had no current payment due with the dentist. He asserts that this newly discovered evidence warranted re-opening the Final Decree. In order to re-open and amend the Decree on the basis of newly-discovered evidence, Weber must establish that: (1) the alleged newly discovered evidence came to him after trial; (2) it was not a want of due diligence which precluded its earlier discovery; (3) the materiality of the new evidence is so great that it would probably produce a different result on retrial; and (4) the new evidence is not merely cumulative, not tending only to impeach or discredit witnesses in the case. *B.B.*, ¶ 40.

11

¶30 We conclude that this information about the dental bill could have been obtained prior to the trial, as the record shows that Hooker's bill was current at that time as well. Hooker's treatment was well underway by September 2002 and was not of a nature to be terminated prematurely. It was therefore reasonable for her to characterize the remaining treatment costs as "outstanding" even though she had not yet been billed. Finally, it is significant that Weber had agreed to pay for the treatment through the placement of the permanent implants.

¶31 Given Weber's prior agreement to pay for the entire course of treatment, the fact that the treatment was at mid-point or beyond at the time of trial was hardly such that "the materiality of the new evidence [was] so great that it would probably produce a different result on retrial." *B.B.*, ¶ 40.

¶32 We conclude that the conditions here--evidenced by the testimony of the parties, and particularly Weber--were not sufficient to justify the re-opening of the court's judgment. Section 40-4-208(3)(b), MCA. We therefore conclude that the District Court abused its discretion in re-opening and amending the Final Decree. We reverse and remand for reinstatement of the Final Decree.

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM RICE
/S/ JIM REGNIER

12