DA 06-0654

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 98

MONTANA PROFESSIONAL SPORTS,
LLC,

        Plaintiff and Appellee,

  v.

NATIONAL INDOOR FOOTBALL
LEAGUE, LLC, an Ohio limited liability
company,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                  In and For the County of Yellowstone, Cause No. DV-06-263
                  Honorable Susan P. Watters, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Shane P. Coleman and Jason S. Ritchie, Holland & Hart, Billings, Montana

        For Appellee:

                James P. Murphy and Bruce F. Fain, Murphy, Kirkpatrick & Fain, Billings,
                Montana

Submitted on Briefs:  November 14, 2007

Decided:  March 24, 2008

Filed:

_____
                       Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 The National Indoor Football League, LLC (NIFL) appeals from an order of the Thirteenth Judicial District, Yellowstone County, denying its motion to set aside default judgment. We affirm.

¶2 NIFL presents the following issues for review:

¶3 Whether the District Court properly awarded a default judgment when Montana Professional Sports, LLC (MPS) had served the summons and complaint on a person not employed by NIFL.

¶4 Whether the District Court properly denied NIFL's motion to set aside the default judgment for excusable neglect.

¶5 Whether the District Court properly determined that MPS had not engaged in sharp practice in obtaining the default judgment.

¶6 Whether the District Court properly awarded $100,000 in punitive damages.

## PROCEDURAL AND FACTUAL BACKGROUND

¶7 NIFL operates an indoor football league with teams located in several states. NIFL has its principal place of business in Lafayette, Louisiana. MPS is a Montana limited liability company with its principal place of business in Billings, Montana. MPS purchased a professional indoor football team from Duane Anderson (Anderson) in March 2005. MPS also acquired from NIFL in March 2005 the right to operate the team in Billings, Montana, as an NIFL franchise.

¶8 NIFL assured MPS that MPS had acquired an exclusive contractual right to operate as the Outlaws within the NIFL. MPS subsequently announced its intention that the team

2

would play as the Billings Outlaws that season. Anderson still owned, however, the federally registered trademark on the name and on images associated with the name. Anderson informed MPS that he intended to enforce his trademark rights. As a result, MPS operated the team under the name Billings Mavericks during the 2005 season while it negotiated with Anderson to purchase the trademark.

¶9 MPS informed NIFL that a federal trademark protected the Outlaws name and image. MPS also indicated to NIFL that MPS intended to resume using the Outlaws name at the start of the 2006 season after it had acquired the trademark. MPS purchased the trademark rights from Anderson on November 10, 2005. MPS immediately apprised NIFL of the acquisition and reiterated its intention to resume using the Outlaws name in 2006. NIFL informed MPS, however, that it already had authorized a team in Florida to rename itself the Osceola Outlaws. MPS urged both NIFL and the Osceola team to reconsider using the name in 2006.

¶10 MPS filed a suit in U.S. District Court in Florida to enforce the trademark against NIFL and the Osceola team when they refused to reconsider. The federal court upheld the trademark on February 7, 2006, and enjoined NIFL and the Osceola team from using the federally trademarked names and images. NIFL subsequently notified MPS in a letter dated March 7, 2006, that NIFL intended to suspend MPS from the league on March 9, 2006, if it operated as the Billings Outlaws, despite MPS's federal trademark rights.

¶11 MPS brought this action on March 9, 2006, to enjoin NIFL from infringing upon its trademark, to remain in the NIFL, and to obtain compensatory and punitive damages. MPS

3

contacted NIFL's general counsel and executive director, Randy Wagley (Wagley), by e-mail and telephone message on March 9, 2006. MPS notified Wagley that it had filed that day for an injunction against NIFL. MPS also informed Wagley that MPS's counsel would be appearing before the District Court in 30 minutes to request a temporary restraining order against NIFL with regard to its threat to suspend MPS from the NIFL. Wagley participated by telephone in an informal discussion with the court and counsel for MPS. No formal record exists of the discussion. The court granted the temporary restraining order and set a hearing date to consider a temporary injunction.

¶12    MPS supplied Wagley with copies of the complaint, summons, application for temporary restraining order, and acknowledgement of service on March 9, 2006. Wagley contacted Montana counsel for consultation on this litigation. Wagley failed to return the acknowledgement of service, however, despite his earlier assurances that he would. MPS therefore engaged a process server to serve a summons and complaint on NIFL at its corporate headquarters in Lafayette, Louisiana, on March 17, 2006.

¶13    MPS provided the process server with NIFL's only known address, the registered address on record with the Louisiana Secretary of State. MPS also supplied the process server with three certificates of service. Two certificates of service specifically named NIFL executive director, Wagley, and NIFL president Carolyn Shiver (Shiver). The third certificate of service left blank the party to be served.

¶14    The process server verified in an affidavit that the address that MPS had given him housed a nondescript office building without any signs indicating what businesses were

4

located there. A large sign reading "LABS" hung over the main entrance. The process server entered the building and approached a reception area. The process server explained that he was looking for Shiver or Wagley of NIFL. The receptionist referred the process server to Lynn Richard (Richard). Richard confirmed to the process server that the office served as the location of NIFL. Richard informed the process server that Shiver was out of the office and that Wagley was difficult to reach. Richard told the process server that she was the "office manager and [could] deliver the papers to Ms. Shiver."

¶15 The process server delivered the documents to Richard and filled Richard's name into the blank certificate of service. Richard did not serve as an NIFL agent or employee. LABS, a company that shared the office building with NIFL, employed Richard. Shiver owned both NIFL and LABS. The process server did not know these facts. MPS's counsel stated in an affidavit that Wagley contacted him the evening of March 17, 2006, to confirm that Wagley was aware that MPS had served the complaint and related documents at the NIFL office.

¶16 MPS and NIFL conducted settlement negotiations regarding this action and the ancillary federal court action in Florida during March and April 2006. NIFL never acknowledged that it had been served, however, and it did not otherwise appear or contact the court. MPS requested that the court twice continue the hearing on MPS's request for a preliminary injunction to allow negotiations to continue. Wagley, acting on NIFL's behalf, expressly consented in a letter to MPS to continuing an April 3, 2006, hearing that the court had rescheduled for April 24, 2006. NIFL still did not appear or contact the court.

¶17 The court entered a default against NIFL on April 10, 2006, on MPS's motion. NIFL did not appear at the rescheduled preliminary injunction hearing set for April 24, 2006. The court issued findings of fact, conclusions of law, and an order granting the preliminary injunction on April 24, 2006. MPS moved for judgment by default on the underlying claims on May 2, 2006. The court held a hearing on MPS's motion for a default judgment on May 24, 2006. MPS did not notify NIFL of the hearing on the default judgment and NIFL did not appear. The court awarded MPS a default judgment against NIFL on May 31, 2006. The court ordered NIFL, on June 9, 2006, to pay $89,627.82 in compensatory damages and $100,000 in punitive damages.

¶18 MPS again served Richard with the default judgment at NIFL's Lafayette, Louisiana, headquarters on June 12, 2006. MPS also informed Wagley of the default by e-mail on June 12, 2006. NIFL obtained Montana counsel on July 5, 2006, and moved to set aside the default judgment on July 10, 2006.

¶19 NIFL first argued that default should be set aside for defective service of process. NIFL asserted that MPS improperly had served Richard, who did not work for NIFL and who therefore could not accept service on its behalf. NIFL next argued that MPS had engaged in sharp practice in obtaining the default judgment against NIFL. NIFL alleged that MPS should have notified NIFL of its intent to seek a default during its ongoing communication with NIFL over the course of the dispute. NIFL finally argued that it satisfied the four part test for motion to set aside default judgment: (1) defaulting party proceeded with diligence; (2) defaulting party's neglect was excusable; (3) defaulting party

has a meritorious defense to the claim; and (4) the judgment will affect the defaulting party injuriously. *Blume v. Metropolitan Life Ins. Co.*, 242 Mont. 465, 467, 791 P.2d 784, 786 (1990) *overruled on other grounds by Essex Ins. Co. v. Jaycie, Inc.*, 2004 MT 278, ¶ 12, 323 Mont. 231, ¶ 12, 99 P.3d 651, ¶ 12.

¶20    The District Court denied NIFL's motion to set aside the default. The court reasoned that MPS had affected proper service based upon Richard representing herself as NIFL's agent. The court also determined that MPS had not engaged in sharp practice. The court instead determined that NIFL had failed to monitor litigation. The court finally concluded that NIFL had failed parts one and two of the *Blume* test. The Court determined that NIFL had not acted diligently when it waited 23 days after receiving notice of the default judgment before retaining Montana counsel. The court determined that NIFL's neglect was not excusable in light of its failure to monitor the litigation. NIFL appeals.

**STANDARD OF REVIEW**

¶21    We disfavor judgments by default in light of our policy that cases are to be tried on the merits. *Caplis v. Caplis*, 2004 MT 145, ¶ 16, 321 Mont. 450, ¶ 16, 91 P.3d 1282, ¶ 16. We review a district court's decision to deny a motion to set aside a default judgment for only a slight abuse of discretion. *Caplis*, ¶ 16. The party seeking to set aside a default has the burden of proof. *Caplis*, ¶ 16. We review a district court's conclusions of law regarding sufficiency of service to determine whether they are correct. *Semenza v. Kniss*, 2005 MT 268, ¶ 9, 329 Mont. 115, ¶ 9, 122 P.3d 1203, ¶ 9. We review related findings of fact to determine whether they are clearly erroneous. *Semenza*, ¶ 9.

7

**DISCUSSION**

¶22 *Whether the District Court properly awarded a default judgment when MPS had served the summons and complaint on a person not employed by NIFL.*

¶23 Defective service of process constitutes proper grounds to set aside a default judgment. *E.g. Ihnot v. Ihnot*, 2000 MT 77, ¶ 8, 299 Mont. 137, ¶ 8, 999 P.2d 303, ¶ 8; *Sink v. Squire*, 236 Mont. 269, 273, 769 P.2d 706, 708 (1989); *Joseph Russell Rlty. Co. v. Kenneally*, 185 Mont. 496, 501, 605 P.2d 1107, 1110 (1980). NIFL contends that service of process is generally defective unless the serving party complies strictly and literally with M. R. Civ. P. 4D. M. R. Civ. P. 4D(3) provides that a party can accomplish out-of-state service of process by any method that the Rules provide for in-state service. M. R. Civ. P. 4D(2)(e) provides that a party can accomplish proper service of process on an out-of-state limited liability company by "leaving [copies of the summons and complaint] at the office of or place of business of the . . . limited liability company . . . with the person in charge of such office."

¶24 NIFL contends that MPS failed to comply strictly and literally with M. R. Civ. P. 4D in light of the fact that Richard was not a "person in charge" of the NIFL office. NIFL did not employ or retain Richard as their agent on March 17, 2006, or at any other time. Richard served as an employee of LABS, a company that shared the office building with NIFL. Richard represented to the process server, however, that she was the office manager with authority to deliver the documents to Shiver. Shiver owned both LABS and NIFL.

8

¶25 NIFL cites a number of our decisions to support its claim that MPS improperly served a person apparently, but not actually, in charge because such service did not strictly and literally comply specifically with M. R. Civ. P. 4D(2)(e). None of the cases that NIFL cites, however, concern either process served on a person apparently in charge or M. R. Civ. P. 4D(2)(e). The cited decisions are limited to scenarios involving constructive service, substituted service, and circumstances where it was undisputed that the plaintiff did not serve the proper person. *E.g. Semenza*, ¶ 15; *Ihnot*, ¶ 4; *Sink*, 236 Mont. at 273, 769 P.2d at 708; *Joseph Russell Rlty Co.*, 185 Mont. at 500, 605 P.2d at 1110.

¶26 MPS asserts that service on a person with apparent authority is permissible, even though such service does not strictly or literally comply with M. R. Civ. P. 4D(2)(e). MPS contends that Richard possessed apparent authority to accept service as the self-described "office manager" for NIFL. MPS argues that Richard therefore constituted a "person in charge" of the office pursuant to M. R. Civ. P. 4D(2)(e) and that it properly served NIFL through Richard.

¶27 MPS cites our decision in *Doble v. Talbott*, 180 Mont. 166, 170-72, 589 P.2d 994, 997-98 (1979), for the proposition that service of process is proper under M. R. Civ. P. 4D(2)(e) if it appears that the person accepting service is authorized to do so. *Doble* concerned a dispute between a debtor and a creditor. The creditor, represented by his attorney, was the plaintiff in an initial action. The debtor later brought a separate action to enjoin the creditor from proceeding with a sheriff's sale. The debtor served the creditor's attorney with the summons and complaint in the injunction action. The creditor argued that

9

service was improper because the creditor had not authorized the attorney to be her agent in the second action. *Doble*, 180 Mont. at 167-70, 589 P.2d at 995-98.

¶28   We determined that the attorney's representation of the creditor in the initial action implied a duty to protect the creditor's interests in the second action. This implied duty sufficiently created authority for the attorney properly to accept service of process on behalf of the creditor under the meaning of M. R. Civ. P. 4D(2). *Doble*, 180 Mont. at 171-73, 589 P.2d at 997-98. Whether the attorney *actually* represented the creditor in the second action was irrelevant for purposes of service of process. We determined that in order to find that the attorney had authority to accept service "[w]hat is necessary is that it *appear* that the attorney was authorized, either expressly or impliedly, to receive service of process for his client." *Doble*, 180 Mont. at 171, 589 P.2d at 997 (internal citations omitted) (emphasis added).

¶29   Other jurisdictions with similarly worded service of process rules have applied apparent authority to accept service of process in a broad range of circumstances. It is appropriate to examine cases that interpret similar federal or state rules of civil procedure in light of the relative paucity of Montana authority on apparent authority to accept service. *See e.g. Albert v. Hastetter*, 2002 MT 123, ¶ 43, 310 Mont. 82, ¶ 43, 48 P.3d 749, ¶ 43; *Estabrook v. Baden*, 284 Mont. 419, 422, 943 P.2d 1334, 1336 (1997).

¶30   A process server in *Kitchens v. Missouri Pacific R. Co.*, 737 S.W.2d 219, 221-22 (Mo. App. 1987), served a summons and complaint on defendant's office manager who later disclaimed being in charge of the office. The Missouri Supreme Court held that service upon

the office manager was proper, regardless of her actual authority, because the office manager was "*apparently* in charge. . . ." *Kitchens*, 737 S.W.2d at 222 (emphasis added). The Utah Supreme Court similarly has acknowledged the role of apparent authority in service of process in *In re Schwenke*, 89 P.3d 117 (Utah 2004). The court noted that service will be "effective where the employee who received service had a significant amount of authority or apparent authority within the organization . . . ." *In re Schwenke*, 89 P.3d at 124. The Georgia Supreme Court likewise determined that service was proper where the defendant's employee represented that she was authorized to accept service when she was not so authorized. *Northwestern Nat. Ins. Co. v. Kennesaw Transp.*, 309 S.E.2d 917, 919 (1983).

¶31     A primary purpose of serving a summons in Montana "is to give notice to the defendant and thereby afford him the opportunity to defend himself or his property – an essential to due process of law." *Ioerger v. Reiner*, 2005 MT 155, ¶ 18, 327 Mont. 424, ¶ 18, 114 P.3d 1028, ¶ 18 (internal citations omitted). Service on an unauthorized agent in *Doble* effectively gave the defendant notice of the lawsuit and thereby afforded him the opportunity to defend himself. *Doble*, 180 Mont. at 172-73, 589 P.2d at 998. The attorney appeared to be authorized to accept the service, and the plaintiff reasonably believed that the attorney was a proper person to accept service. The attorney had an existing relationship with the defendant that practically ensured that the defendant would receive service. The attorney provided the defendant with the summons and complaint, thus providing the defendant notice of the lawsuit. *Doble*, 180 Mont. at 167-70, 589 P.2d at 995-98. We deemed the

11

method of giving the defendant notice in *Doble* to be both fair and reasonable in light of the facts and circumstances.

¶32 MPS's process server served the summons and complaint at NIFL's main and only office pursuant to M. R. Civ. P. 4D(2)(e). The process server served NIFL at the address on record with the Louisiana Secretary of State. The receptionist did not notify the process server that he was not at the NIFL offices when he informed her that he intended to serve Shiver and Wagley of NIFL. Richard indicated to the process server that Shiver was not in the office and that Wagley was difficult to reach. Richard affirmatively represented to the process server that she was the "office manager and [could] deliver the papers to Ms. Shiver." The process server reasonably believed that he had served a proper person. Wagley contacted MPS hours later to confirm that he was aware that MPS had served NIFL with a summons and complaint.

¶33 Service was proper under these circumstances. Richard held herself out to be in charge at NIFL's one and only office. The process server had no reason to doubt that Richard was in charge based on Richard's affirmative representation and the surrounding circumstances. Although MPS served a person not employed by NIFL, it did not serve a mere stranger to NIFL. Shiver, NIFL's president, also owns LABS, the company that shares office space with NIFL and actually employed Richard. Service on Richard gave NIFL proper notice of the lawsuit and afforded it the opportunity to defend itself and its property. *Ioerger*, ¶ 18. Wagley actually confirmed that NIFL had been served the same day of

12

service. Service on Richard fairly and reasonably effectuated the purpose of giving NIFL adequate notice to defend the action. *See Doble*, 180 Mont. at 171-72, 589 P.2d at 997-98.

¶34 *Whether the District Court properly denied NIFL's motion to set aside the default judgment for excusable neglect.*

¶35 A court may set aside a default judgment if the defendant shows that the judgment resulted from "mistake, inadvertence, surprise, or excusable neglect." M. R. Civ. P. 55(c) and 60(b)(1). We apply a conjunctive four-part test when evaluating whether to set aside a default judgment under M. R. Civ. P. 60(b)(1): (1) the defaulting party proceeded with diligence; (2) the defaulting party's neglect was excusable; (3) the defaulting party has a meritorious defense to the claim; and (4) the judgment, if permitted to stand, will affect the defaulting party injuriously. *Blume*, 242 Mont. at 467, 791 P.2d at 786.

¶36 The District Court determined that NIFL failed parts one and two of the test. The District Court deemed NIFL's failure to retain Montana counsel until 23 days after the court awarded default judgment to show lack of diligence under *Blume*, 242 Mont. at 469, 791 P.2d at 786-87, and *In re Winckler*, 2000 MT 116, ¶ 18, 299 Mont. 428, ¶ 18, 2 P.3d 229, ¶ 18. The court also determined that NIFL's neglect was not excusable because NIFL had failed its affirmative duty to monitor the litigation. *Caplis*, ¶¶ 24-25.

¶37 NIFL first argues that a 23-day delay in retaining Montana counsel cannot constitute lack of diligence in light of the fact that NIFL filed its motion to set aside within the 60-day filing window provided in M. R. Civ. P. 60(b). NIFL contends that nothing in either *Blume* or *Winckler* shortens the 60-day filing window.

¶38 We reversed a district court's denial of a motion to set aside default judgment in *Blume*. The district court awarded a default judgment after a mailing room mistake had resulted in the defendant losing the summons and complaint. *Blume*, 242 Mont. at 466, 791 P.2d at 785. We determined that Metropolitan Life Insurance had satisfied part one of the test. It had proceeded with diligence when it "hired a Billings firm to represent it within days of discovering the default judgment and filed a motion to set aside the default judgment within a week of discovering the default" in addition to meeting the 60-day time frame. *Blume*, 242 Mont. at 469, 791 P.2d at 786-87.

¶39 We also reversed a district court's denial of a motion to set aside default judgment in *Winckler*. The district court entered a default judgment in a dissolution where the husband was unrepresented and did not understand how to respond to the summons and complaint. *In re Winckler*, ¶¶ 1-9. We determined that the husband had acted with diligence when he "immediately retained Montana counsel" and filed a motion to set aside within one week of learning of the default judgment. The husband also met the 60-day time frame. *In re Winckler*, ¶ 18.

¶40 NIFL correctly asserts that neither *Blume*, nor *In re Winckler*, limited the 60-day time frame provided in M. R. Civ. P. 60(b). NIFL overstates the connection, however, between the 60-day time frame and a court's determination of whether defendant has proceeded with diligence. M. R. Civ. P. 60(b) merely provides a time bar, after which the defendant no longer properly can file a motion to set aside a default judgment. We never have equated meeting Rule 60(b)'s 60-day time limit with proceeding with diligence. *Blume* and *Winckler*

14

both emphasized primarily the fact that the defendants had retained Montana counsel and had filed motions to set aside the defaults within one week of receiving notices of the default judgments in their analyses of the diligence prong. *Blume* and *Winckler* acknowledged that the defendants had met the 60-day time frame, but did not focus their analyses on this fact. *In re Winckler*, ¶ 18; *Blume*, 242 Mont. at 469, 791 P.2d at 786-87.

¶41 The Court created a discrete analysis of diligence in part one of our four-part test under *Blume* that would have no use or application if merely meeting the 60-day time frame were dispositive. A court may use its discretion to determine that the defendant has not proceeded with due diligence even though the defendant has satisfied the 60-day time frame provided by M. R. Civ. P. 60(b). The court may look at the surrounding facts and circumstances to make this determination.

¶42 NIFL waited 23 days after receiving notice of the default judgment before it even retained Montana counsel. NIFL did not file its motion to set aside until 28 days after receiving notice of the default judgment. The District Court also considered the fact that NIFL had contacted its Montana counsel with regard to the underlying matter as early as March 16, 2006, and yet waited 23 days after learning of the judgment before engaging that counsel. We have not determined that a party must demonstrate that it retained counsel or filed a motion within a specific time frame in order to demonstrate that the party has proceeded with diligence. *See e.g. In re Winckler*; *Blume*, 242 Mont. 465, 791 P.2d 784. Under these particular circumstances, however, the record demonstrates that the District Court did not slightly abuse its discretion when it determined that NIFL did not proceed with

15

diligence pursuant to our four-part test. *Caplis*, ¶ 16; *Blume*, 242 Mont. at 467, 791 P.2d at 786.

¶43    NIFL also argues that the District Court erred when it refused to excuse NIFL's neglect. NIFL contends that its general counsel, Wagley, reasonably believed that the entire litigation was moot for three reasons. First, Wagley knew that MPS was negotiating a settlement with the Osceola team in ancillary litigation that would permit MPS to use the Outlaws name permanently. Second, Wagley believed that NIFL's dispute with MPS had ended after MPS had secured a preliminary injunction in Montana. Finally, MPS induced Wagley to believe that it had not pursued further litigation when MPS did not mention the litigation in ongoing communications with Wagley regarding the injunction and other settlement issues.

¶44    The District Court relied on *Caplis* to conclude that NIFL had failed to monitor the litigation and therefore its neglect was not excusable. We held in *Caplis* that litigants have an affirmative duty to monitor litigation. *Caplis*, ¶ 24. The defendant in *Caplis* argued that ongoing settlement discussions reasonably induced him to conclude that he need not monitor the litigation, resulting in a default judgment against him. We affirmed the default judgment and held that settlement discussions and other peripheral litigation matters were "not an excuse to neglect ongoing litigation." *Caplis*,¶ 26.

¶45    NIFL has not advanced any additional legal argument or pointed to any additional authority to support its contention that its neglect was excusable. We affirmed a default judgment in *Caplis* where the defendant, a lay person, failed to monitor the litigation.

16

*Caplis*, ¶¶ 6, 24-25. Wagley is not a lay person. He is an attorney and member of the Louisiana bar. He certainly had a duty to monitor litigation at least equal to the lay defendant in *Caplis*. We determine that the District Court did not slightly abuse its discretion when it determined that NIFL's neglect was not excusable. *Caplis*, ¶ 16.

¶46 *Whether the District Court properly determined that MPS had not engaged in sharp practice in obtaining the default judgment.*

¶47 NIFL contends that the District Court erred when it did not set aside the default judgment pursuant to M. R. Civ. P. 60(b)(6). Rule 60(b)(6) permits a judgment to be vacated "for any other reason justifying relief from the operation of the judgment." NIFL relies solely on our decision in *Maulding v. Hardman*, 257 Mont. 18, 847 P.2d 292 (1993), to support its contention that the judgment should be set aside under this rule. We reversed a district court's decision to deny a motion to set aside default judgment in *Maulding* because the plaintiff's sharp practice in obtaining the judgment constituted an "other reason justifying relief from the operation of the judgment." *Maulding*, 257 Mont. at 25-26, 847 P.2d at 297-98; M. R. Civ. P. 60(b)(6).

¶48 *Maulding* concerned a personal injury action arising from a car accident in which Hardman was the driver. Maulding obtained a default judgment against Hardman and attempted to collect the damages from Hardman's insurance company. *Maulding*, 257 Mont. at 20-22, 847 P.2d at 294-95. We determined that Maulding's counsel had engaged in sharp practice primarily because Maulding's counsel "knew of the insurance company's interest in [the] lawsuit and proceeded at all times with an eye toward collecting from the insurance

17

company once he obtained a judgment for Maulding." *Maulding*, 257 Mont. at 26, 847 P.2d at 297. Maulding's counsel thwarted Hardman's insurance company's attempts to obtain information about the claim. Maulding also withheld pertinent information from the court. Both of those factors weighed heavily in our decision in *Maulding*. *Maulding*, 257 Mont. at 25-26, 847 P.2d at 297-98.

¶49 Neither of these factors exists here. NIFL has not alleged that MPS ever withheld pertinent information from the court in this case. NIFL also has not alleged that it ever made any requests for information or documents relating to the litigation that MPS deliberately thwarted or refused to comply. NIFL only alleges that MPS did not voluntarily reveal information it had no legal duty to reveal while selectively revealing other information. NIFL advanced this same argument to support its claim of excusable neglect – that it reasonably relied on ongoing settlement and litigation discussions to its detriment. We rejected NIFL's reliance on settlement discussions because NIFL failed its affirmative duty to monitor litigation. ¶ 45.

¶50 NIFL's failure to monitor litigation not only distinguishes it from *Maulding*, but also renders relief from judgment under M. R. Civ. P. 60(b)(6) generally inapplicable. A successful Rule 60(b)(6) motion requires that the movant demonstrate each of the following elements: "(1) extraordinary circumstances; (2) the movant acted to set aside the judgment within a reasonable period of time; and (3) the movant was blameless." *Essex Ins. Co. v. Moose's Saloon, Inc.*, 2007 MT 202, ¶ 25, 338 Mont. 423, ¶ 25, 166 P.3d 451, ¶ 25 (internal citations omitted). We refused to excuse NIFL's neglect because it had failed its affirmative

18

duty to monitor the litigation. ¶ 45. We acknowledged by this determination that NIFL could not be blameless for the default judgment against it. *Essex Ins. Co.*, ¶ 25. The District Court properly dismissed NIFL's motion pursuant to M. R. Civ. P. 60(b)(6).

¶51    *Whether the District Court properly awarded $100,000 in punitive damages.*

¶52    NIFL challenges the District Court's award to MPS of $100,000 in punitive damages. NIFL contends that MPS had failed to establish by clear and convincing evidence all of the nine elements required pursuant to § 27-1-221(7)(b)(i)-(ix), MCA, for punitive damage awards. NIFL specifically challenges the sufficiency of the court's determination of NIFL's net worth pursuant to § 27-1-221(7)(b)(vi), MCA. NIFL challenges the validity of the punitive damage award for the first time on appeal.

¶53    We generally will not address issues that were not raised before the district court. *Owens v. Montana Dept. of Revenue*, 2007 MT 298, ¶ 2, 340 Mont. 48, ¶ 2, ___ P.3d ___, ¶ 2. NIFL argues that we nevertheless should address this issue because NIFL never had an opportunity to contest damages. NIFL, in fact, had two previous opportunities to contest the damages award. The District Court allowed NIFL ten days following the award to offer evidence to challenge the damage amount. NIFL also could have raised the damages issue in a motion for relief from judgment under M. R. Civ. P. 60(b)(6), commonly referred to as the "catchall provision." *E.g. In re Hopper*, 1999 MT 310, ¶ 21, 297 Mont. 225, ¶ 21, 991 P.2d 960, ¶ 21.

¶54	Relief is available under M. R. Civ. P. 60(b)(6) "for situations other than those enumerated in the first five subsections of the rule." *Matthews v. Don K Chevrolet*, 2005 MT 164, ¶ 17, 327 Mont. 456, ¶ 17, 115 P.3d 201, ¶ 17 (internal citations omitted). We adopted in *Matthews* the U.S. Supreme Court's interpretation of this rule. *Matthews*, ¶ 17. The U.S. Supreme Court explained that "[i]n simple English, the language of the 'other reason' clause [of Rule 60(b)(6) is] for all reasons except the five particularly specified [in Rule 60(b)(1)-(5)] . . . ." *Klapprott v. U.S.*, 335 U.S. 601, 614-15, 69 S. Ct. 384, 390 (1949).

¶55	We have not yet had an occasion to consider a challenge to a punitive damage award under M. R. Civ. P. 60(b)(6). We have applied M. R. Civ. P. 60(b)(6) however, in a broad range of circumstances. We determined in *Hall v. Heckerman*, 2000 MT 300, ¶¶ 6-10, 18, 302 Mont. 345, ¶¶ 6-10, 18, 15 P.3d 869, ¶¶ 6-10, 18, that a district court properly awarded relief under M. R. Civ. P. 60(b)(6) when it reversed a motion for summary judgment because the facts and law did not support the judgment. We determined in *Shultz v. Hooks*, 263 Mont. 234, 235-37, 867 P.2d 1110, 1111-12 (1994) *overruled on other grounds by In re Markegard*, 2006 MT 111, ¶ 24, 332 Mont. 187, ¶ 24, 136 P.3d 532, ¶ 24, that potential judicial bias constituted proper grounds for relief under M. R. Civ. P. 60(b)(6). We determined in *Winn v. Winn*, 200 Mont. 402, 411, 651 P.2d 51, 55 (1982), that an erroneous valuation of husband's stock could have constituted grounds to award relief from a marriage decree pursuant to M. R. Civ. P. 60(b)(6).

¶56	A punitive damage award rendered in violation of the applicable statute presents a reasonable grounds for relief under M. R. Civ. P. 60(b)(6). Such a challenge falls within the

20

ambit of the broad range of issues for which we have allowed relief in the past. Our determination in *Winn*, in which the district court apportioned marital assets based upon an erroneous valuation, seems particularly analogous to the punitive damage award here. As we determined in *Winn*, an award based on incorrect valuation, like the alleged false statement of NIFL's net worth, can constitute an "other reason justifying relief from operation of the judgment," pursuant to M. R. Civ. P. 60(b)(6). NIFL may not now raise this issue for the first time on appeal.

¶57 We affirm.

/S/ BRIAN MORRIS

We Concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER

Justice Jim Rice concurring in part and dissenting in part.

¶58 I concur with the Court's holding under Issue 1, and agree that service of process was "fairly and reasonably effectuated." ¶ 33. However, I dissent from the Court's decision not to set aside the default judgment, which I believe was entered unfairly and unreasonably under the circumstances—including many circumstances which the Court does not mention.

21

¶59    Upon the filing of the suit, Wagley, located in Louisiana, was given less than an hour notice of the TRO hearing, but nonetheless participated by telephone. Thereafter, frequent telephone and e-mail communications ensued between MPS's counsel, James Murphy, and Wagley. As the Court notes, these communications included settlement negotiations regarding the merits of the underlying trademark dispute, as well as exchanges about the action pending in Billings. As part of these exchanges, Murphy began forwarding to Wagley the documents being filed in the action, including summons and complaint, TRO application, supporting affidavits, orders and motions. The parties then entered several stipulations whereby the hearings scheduled in the action were postponed and the TRO was extended. However, underneath the surface of these written and oral communications, much more was going on. The record sets forth these events:

¶60    On March 17, Murphy e-mailed Wagley, attaching "an order of Judge Watters extending the TRO and moving the hearing to Monday, April 3, 2006."

¶61    On March 28, MPS filed the affidavit of service of the summons and complaint upon NIFL. This filing was <u>not</u> sent to Wagley.

¶62    On March 31, Murphy e-mailed Wagley regarding another extension of the TRO and continuance of the hearing, instructing him to submit a letter on NIFL letterhead consenting to a continuance, and also suggesting that he (Murphy) ask Judge Watters "to make the TRO <u>permanent to a trial date</u>." (Emphasis added.) Wagley responded by faxing the requested letter.

22

¶63    On April 3, Murphy e-mailed Wagley, advising him that "Judge Watters did not have a problem extending the hearing and set it for April 24, 2006."

¶64    On April 7, MPS filed a motion for default against the NIFL, but did not provide a copy to Wagley. Further, MPS took the NIFL's default, which was not forwarded to Wagley.

¶65    On April 21, the parties exchanged e-mails about another extension. Murphy indicated MPS would not agree to further extensions, and that entry of a preliminary injunction was "probably a foregone conclusion," given that the football season was well under way. Wagley responded by stating, "That's fine. I believe the status quo is working out OK at this time." (Emphasis added.)

¶66    On April 24, the District Court entered a preliminary injunction. Murphy forwarded a copy of the order to Wagley.

¶67    On May 1, MPS filed a motion for default judgment and order setting hearing. These documents were not forwarded to Wagley.

¶68    Also on May 1, Murphy had an ex parte meeting with the district court judge. In addition to not being noticed, the meeting does not appear on the docket or in the District Court files. Murphy's timesheet describes the meeting: "Meeting with [district court judge] turned into a long visit on notice issue and when it is required; review cases with her; she used several of her own volumes; conclusion is that standard to set aside is higher for both default and judgment; she understands our position and our plan . . . ."

¶69     On May 24, MPS filed its proposed findings, conclusions and judgment order for the default judgment hearing. The proposed judgment imposed punitive damages against NIFL in the amount of $25,000.

¶70     On June 1, following the hearing, the court's findings, conclusions and judgment were entered. The judgment enters punitive damages against NIFL in the amount of $100,000.

¶71     While reasonable minds may draw different conclusions from these facts, I am of the view that entry of a default judgment under these circumstances was improper. Although the Court faults NIFL for failing to monitor the litigation, it is clear that Wagley *believed* he was monitoring the status of the litigation, and MPS gave him every reason to think so, whether intentionally or not. True, Wagley was a lawyer, should have been more attentive to the litigation and should have retained local counsel. However, he understood that the documents filed in the action were being provided to him. Further, Murphy had suggested to him that the TRO be made permanent "until a trial date"—necessarily implying the case would proceed to a trial. Wagley was comfortable with the status quo of the case as he understood it to be, and he expressed this to Murphy.

¶72     Wagley had not a clue that, as he was communicating with Murphy about an extension, MPS was preparing to request that NIFL's default be taken. Nor did he know thereafter that MPS moved for a default judgment and Murphy had unilaterally met with the judge to advise the court of his "position and plan" for obtaining the judgment. Then, at the default judgment hearing, the punitive damage claim against NIFL which was set forth in MPS's proposed judgment somehow quadrupled.

24

¶73     The Court distinguishes the facts in *Maulding* and reasons that MPS had "no legal duty to reveal" its pursuit of the default judgment.  However, I find it notable that, in *Maulding*, we reversed the default judgment even though plaintiff's counsel "was not required to inform the insurance company of the proceedings." *Maulding*, 257 Mont. at 26, 847 P.2d at 297.  While the judge and counsel in this case were no doubt trying to properly fulfill their individual duties, I believe the facts of this matter nonetheless converged to establish the extraordinary circumstances necessary for relief from the default judgment under M. R. Civ. P. 60(b)(6).  As to NIFL, this was an unfair and unreasonable judgment, including an inflated punitive damage award.  I would reverse.

/S/ JIM RICE